# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 26, 2016 Session

## STATE OF TENNESSEE v. BILLY HILL

**Appeal from the Criminal Court for Knox County**
**No. 101915    Steven W. Sword, Judge**

---

**No.  E2015-00811-CCA-R3-CD – Filed February 9, 2017**

---

The Defendant, Billy Hill, was convicted by a Knox County Criminal Court jury of second degree murder, a Class X felony, for the 1986 killing of his mother.  *See* T.C.A. § 39-2-211 (1986) (repealed 1989).  The trial court sentenced the Defendant to twenty-four years' confinement.  On appeal, the Defendant contends that (1) the trial court erred by denying his motions to dismiss based upon lost and destroyed evidence, a due process violation created by the extensive pre-indictment delay, and a violation of his right to a speedy trial, (2) the trial court erred by allowing improper witness testimony, (3) the trial court erred by denying his motion for a mistrial after a witness violated a court order prohibiting testimony about the Defendant's alleged violent conduct against the witness, (4) the trial court erred by refusing to provide a jury instruction relative to the State's obligation to corroborate his statements, and (5) the prosecutor engaged in misconduct during closing argument.  We have also considered whether the statute of limitations for second degree murder had expired before the commencement of the prosecution.  Although we affirm the Defendant's conviction, we remand for the entry of a corrected judgment reflecting the proper felony classification for second degree murder at the time of the offense.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed;**
**Remanded for Entry of a Corrected Judgment**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J. joined.

Mike Whalen (on appeal and at trial), Knoxville, Tennessee; Mark Stephens, District Public Defender; and Julia Gautreau and Christy Murray (pretrial), Assistant District Public Defenders, for the appellant, Billy Hill.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Charme P. Allen, District Attorney General; Steve Garrett and Phillip Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At the trial, Wanda Brown testified that she and Bobbie Hill, who was the victim and the Defendant's mother, had been friends since the 1960s. Ms. Brown and the victim went to a fair on Friday, September 12, 1986, around 6:00 p.m. and returned to Ms. Brown's home around 10:30 p.m. The victim lived about six miles from Ms. Brown's home, and Ms. Brown assumed the victim drove home when she left that night. The victim appeared to be in a good mood that night. Ms. Brown said she was unaware the victim was romantically involved with David Nave at the time of her death but clarified after reviewing her statement to the police that although she knew the victim was dating someone, she did not know the man's name. Ms. Brown recalled telling the police that although the victim was thinking about ending the relationship, the man had bought concert tickets for the victim.

Ernest Wilson, Jr., testified that he knew the Defendant around the time of the victim's death and that the Defendant frequented an arcade at which Mr. Wilson worked in the 1980s. He said the Defendant drove a black Camaro at the time and was friends with Todd Haskins.[1] Mr. Wilson recalled that on September 12, he drove a school bus for a high school football team, that he went to the arcade after he dropped off the students, and that the Defendant, Mr. Haskins, and "the Irvin boys" were there. The Defendant, Mr. Haskins, and the Irvin boys left around 9:00 p.m. Mr. Wilson said Knoxville Police Officers Mike Parker, Vic Voyles, J.D. White, and Tommy Stiles also frequented the arcade, which was near the victim's home. Mr. Wilson left the arcade between 12:30 and 1:30 a.m., drove past the victim's home, and saw three cars parked in the driveway of the victim's home. Mr. Wilson saw the victim's car, the Defendant's car, and another black car in the driveway. Mr. Wilson knew the Defendant's black car and noted the Defendant always backed into the victim's driveway and parked in the same place. After reviewing his 1986 police statement, Mr. Wilson recalled telling the police that the Defendant drove a 300ZX, but he remained adamant he saw the Defendant's black car parked in the driveway. After reviewing his 2011 police statement, Mr. Wilson agreed he told Knoxville Police Investigator Day that he saw three cars in the driveway, that he saw the Defendant's black car, that another car was gray, and that he did not know who owned the other two cars. Mr. Wilson had never seen those two cars in the neighborhood and agreed he told Investigator Day that the Defendant drove a Camaro IROC or IROC Z. Mr. Wilson was adamant he saw the Defendant's car at the victim's home regardless of the make and model.

---

[1] The witness's name appears in the record as Todd Haskins and Todd Haskell. We use Haskins for consistency.

Retired Knoxville Police Officer Larry Gilland testified that he responded to the victim's home on September 14, 1986, and that the Defendant reported finding the victim. The Defendant reported to Officer Gilland that the victim had been stabbed multiple times. Although the Defendant was inside the home when Officer Gilland arrived, two men were outside the home and did not know why Officer Gilland was there. Officer Gilland and the Defendant spoke on the front porch, and Officer Gilland recalled the Defendant's calm demeanor. The Defendant reported finding the victim inside the home and thinking a burglary had occurred. The Defendant mentioned a previous burglary at the home, thought a burglar might have entered the home through a rear window, and said the window was usually locked and secured with a bar. Officer Gilland said it was impossible for someone to have entered the home through the window because it was small and because undisturbed cobwebs and dust were on and around the window.

Photographs of the scene showed holes in a door, which the Defendant reported to Officer Gilland were unrelated to the victim's death and were caused by the Defendant's previous "fits of frustration and rage." A photograph of the bedroom where the victim was found showed a pried-open lockbox. Officer Gilland said that when the police searched the home again two months after the killing, the box's lock was found just outside the carport door.

Retired Knoxville Police Officer Bob Gass testified that he assisted Officer Gilland in securing the scene. Officer Gass recalled the Defendant's demeanor as the victim was removed from the home by medical personnel and said the Defendant displayed no emotion and grinned.

Valarie Mabon, records keeper for the United States Postal Service, testified that the victim worked for the postal service at the time of her death. The Defendant submitted claims for the victim's unpaid compensation and an application to receive life insurance benefits, which totaled approximately $70,000.

Knoxville Police Investigator Jeffrey Day testified that in 2011, he began investigating the victim's killing after speaking to someone who inquired about the victim's death. Investigator Day reviewed the police file, attempted to locate the witnesses identified in the file, and located new witnesses. Investigator Day was unable to locate the physical evidence recovered from the scene and the medical examiner's office. The lost evidence included the lockbox, a vacuum cleaner bag, a cassette found taped to the windshield of a car parked at the scene, hair, the victim's blood-soaked nightgown, keys, blood collected on cotton swabs, and the Defendant's knife. The confiscated knife was not the suspected murder weapon. Investigator Day said no evidence remained that could have been analyzed for the presence of DNA, and he conceded the blood evidence could have been analyzed for blood type and gender in 1986, although the analyses were not performed. Investigator Day conceded that

although fingerprints were on the lockbox found inside the victim's home, the fingerprints did not belong to the Defendant, his wife at the time of the killing, or the Defendant's friend, Mr. Haskins.

Investigator Day testified that the victim's family hired Dale Goin to investigate the victim's killing and that Mr. Goin's file was provided to the original investigator, Tommy Stiles. Although Investigator Day knew the victim had a romantic relationship with David Nave, Investigator Day did not interview him. Investigator Day did not know what, if anything, was on the cassette found at the scene and was unsure whether anyone listened to it at the time of the initial investigation. Investigator Day assumed the cassette was taped to the victim's car between late Friday night and Sunday afternoon when the Defendant found the victim.

Investigator Day testified that although Detective Stiles believed the Defendant killed the victim for financial gain, the Defendant did not have financial problems at the time of the victim's death. The victim's family told Investigator Day that the victim oversaw the Defendant's trust fund and provided the Defendant with adequate financial resources. Investigator Day also learned that the Defendant received additional income from his partial ownership of a liquor store.

Investigator Day learned from the Defendant's 1986 statement to Detective Stiles that burglaries occurred in neighborhood where the victim lived and that the perpetrators of the burglaries were not investigated as possible murder suspects. Investigator Day said that in 1986, Mr. Wilson identified the car in the victim's driveway as a black 300 ZX, that Detective Stiles may have said the black car was a Camaro, and that in 2011, Investigator Day may have asked Mr. Wilson whether the black car was an IROC Z. The victim drove a 300 ZX at the time of her death.

Knox County Sheriff's Lieutenant Steven Patrick provided Knox County Detention Center records regarding the Defendant and Julio Allen. The records reflect that the Defendant and Mr. Allen were confined in the same jail pod between October 21, 2013, and December 26, 2013.

Julio Allen testified that he met the Defendant at the jail in late October 2013. Mr. Allen had previous state and federal felony convictions and had served time in prison. He was on parole in Illinois at the time of the trial for attempted armed robbery and had convictions for aggravated unlawful use of weapon and aggravated battery in Illinois. His latest conviction related to unlawful possession of a firearm, and he knew he faced possible consecutive sentences relative to the firearm conviction, the Illinois attempted armed robbery conviction, and his pending Knox County matter. In September 2013, Mr. Allen was charged with aggravated assault in Knox County, and he was unable to obtain release pending resolution of the case.

-4-

Mr. Allen testified that he and the Defendant discussed the charges that led to their respective incarcerations and that the Defendant told Mr. Allen he was in jail "because of this b---- that got killed." Ultimately, the Defendant asked Mr. Allen for assistance with his case because of Mr. Allen's experience with the criminal justice system. Mr. Allen told the Defendant he would need to know the events leading to the Defendant's charges, and the Defendant reported that he "made a mistake" more than twenty years earlier. When Mr. Allen asked about the mistake, the Defendant said that "[he] killed [his] mother" for insurance money, that he was using drugs at the time of the killing, and that he and the victim had "a falling out." Mr. Allen stated that the Defendant claimed that he did not have any money, that he "lost it," that he stabbed the victim five or six times, that he went home wearing bloody clothes, and that he told his then-wife what occurred. The Defendant told Mr. Allen that he made the scene look like a robbery, that he broke into a lockbox, and that he took about $4,000 of the victim's property. The Defendant reported inheriting approximately $60,000, after other family members received shares, and said his then-wife never reported him to the police because she was under the influence of drugs at the time of the killing.

Mr. Allen testified that he provided the information he learned from the Defendant to Investigator Day because he hoped the State would consider his cooperation in determining how to resolve his pending criminal charges. He denied having been promised anything in exchange for his testimony.

Barbara Hill Holsinger, the Defendant's second former wife, testified that she and the Defendant had a daughter in 1991. Ms. Holsinger said she became scared of the Defendant because he prevented her from having contact with anyone, including her family. She said that they argued in September or October 1991 and that she suffered injuries as a result. Ms. Holsinger said that during the incident, the Defendant told her that he had stabbed the victim to death and that he would get away with killing Ms. Holsinger. She said the Defendant stated that he made the victim's killing look like a burglary by making it appear as though someone had entered the victim's home through the laundry room window and had "rummaged through" the home. She said the Defendant mentioned "something about a lockbox and . . . bonds or something like that." She said the Defendant told her that he left a lockbox outside the home also in an effort to make the killing look like a burglary. Ms. Holsinger stated that the Defendant told her that he waited in a bedroom closet for the victim to arrive home, waited for the victim to change her clothes, jumped out of the closet, and began stabbing the victim.

Ms. Holsinger testified that the Defendant also told her that he believed the victim was killed because the victim requested the investigation into the Defendant's father's suicide be reopened. Ms. Holsinger and the Defendant divorced in 1994, and she admitted that she did not participate in the proceedings and that she did not contest the Defendant's having custody of their daughter. Ms. Holsinger admitted she stayed overnight at the Defendant's home when she had child visitation with her daughter.

Shannon Wells, the Defendant's first wife, testified that she and the Defendant met when they were teenagers, that they fell in love and wanted to get married, that her parents would not consent for them to marry, that she ran away from her parents' home in Alabama, and that she and the Defendant began living with the victim. Ms. Wells and the Defendant eventually married with her parents' consent in June 1986. Ms. Wells and the Defendant continued living with the victim for a period of time but later moved to an apartment.

Ms. Wells testified that the Defendant treated the victim poorly, frequently asked the victim for money, and became angry when the victim did not do as he asked. Ms. Wells heard the Defendant refer to the victim as a "b----" when he became angry. Ms. Wells heard the Defendant tell the victim that he blamed the victim for his father's suicide. Ms. Wells said that when the Defendant's father died, the Defendant inherited a large amount of money but that the money was provided to the Defendant in monthly installments and was overseen by the victim, who was the executrix of the Defendant's father's estate. Ms. Wells said that the Defendant and the victim argued frequently about the money and that the Defendant asked the victim for money if he needed money beyond his monthly distribution. Ms. Wells recalled that at some point, the Defendant wanted a new vehicle but that the victim would not "sign" for the money. The Defendant became angry and thought the victim was spending his money. The Defendant also mentioned to Ms. Wells that the victim kept bonds in a lockbox inside the victim's home and that although the bonds were in the Defendant's name, the victim's signature was required to cash them.

Ms. Wells testified that on September 12, 1986, she and the Defendant lived in a Knoxville apartment. She recalled that the Defendant returned home with Mr. Haskins around midnight and that the men were agitated and frantic. She heard Mr. Haskins say, "Oh, f---, oh f--- . . . what are we going to do," and the Defendant's telling Mr. Haskins to "shut up" because the Defendant needed to think. Ms. Wells said that she saw blood on the Defendant's clothes and that when she asked what was wrong, the Defendant said, "[T]he b---- made me do it." The Defendant grabbed clothes, garbage bags, and cleaning items and said he needed to clean his car, and the Defendant and Mr. Haskins left. Ms. Wells said that the Defendant returned home between 4:00 and 5:00 a.m. and that he wore different clothes, was calm, and went to sleep.

Ms. Wells testified that sometime around the time the victim's body was discovered, the Defendant told Ms. Wells to tell the police that she went fishing with him on the night of the killing. Ms. Wells recalled the Defendant's stating she would be sorry if she did not tell the police they were fishing. Days after the police finished processing the scene, the Defendant and Ms. Wells returned to the victim's home. Ms. Wells recalled that the Defendant gathered items he wanted, that he was not emotional, and that he ordered her to clean the victim's bedroom. Ms. Wells said that sometime after the victim's death, the Defendant grabbed her hair, put a knife to her throat, and said, "[Y]ou

know what happened to my mother, you don't think I'll hesitate for a second with a w----like you." She said she was terrified. She recalled other instances in which the Defendant threatened to harm her family if she told the police what occurred on the night of the victim's death. Ms. Wells returned to her family in Alabama about one month after the killing. She said that after she returned to Alabama, she began working at Walmart. She recalled one occasion in which she received a telephone call while at work. She answered the call and said the Defendant told her "you didn't think I couldn't find you, did you? I'll always be able to find you." She said that the Defendant laughed and that she ended the call.

Ms. Wells testified that she initially told the police she and the Defendant were fishing at the time of the victim's death but that she returned to Knoxville in December 1986 for a second interview. Although Ms. Wells did not tell the police everything that transpired on the night of the killing, she told the police that she and the Defendant were not fishing and that the Defendant was capable of killing the victim. She said she did not provide the police with any details because the Defendant knew where she lived and worked in Alabama. She said that was her last contact with the police until 2011. She said that in 2011, Investigator Day contacted her and that she agreed to speak with him about the night of the victim's death. Ms. Wells told Investigator Day that the Defendant came home on the night of the killing with blood on his clothes.

Ms. Wells testified that on Sunday morning before the victim's body was discovered, the Defendant left to play football with his friends. She said that the Defendant asked if she knew where he could find the football and that she told him it was at the victim's house. She said that the Defendant left and that the police arrived at their apartment around 7:00 p.m. She agreed she told the police that she and the Defendant were fishing on Friday night. She said that when the police searched their apartment, stolen goods were found and that she, the Defendant, and the Defendant's friend were charged with possession of stolen goods. She said that she returned to Knoxville to address the criminal charge and that she spoke to the police about the victim's killing. She said that the police knew she had nothing to do with the stolen goods and dismissed the charge and that she decided to tell the police that the Defendant was not with her on the night of the victim's death. She did not know the police suspected that she was involved in the killing and that she and the Defendant created mutual alibis.

Ms. Wells testified that although she told the police in December 1986 that she believed the Defendant was capable of killing the victim, she did not tell the police the Defendant and the victim argued about money. Ms. Wells agreed the victim called her on the night of the killing because the victim had fair tickets. She said that on the night of the killing, the Defendant did not leave blood inside their apartment and that she only saw blood on his hands and clothes. She said that the Defendant probably knew she knew what he had done and that the Defendant also knew she was terrified of him. She

agreed the Defendant did not say, "I did it." Ms. Wells stated that she did not know Ms. Holsinger existed until the trial and that she had never heard the name Julio Allen.

Dr. Darinka Mileusnic-Polchan, Chief Medical Examiner, testified that Dr. Frances Patterson performed the victim's autopsy in 1986. Dr. Mileusnic-Polchan reviewed the autopsy report and corresponding materials and concluded that the victim suffered six stab wounds to the chest above the heart, two of which went through the heart, and "slashes" to the upper chest and lower neck. The victim also suffered blunt force trauma to the forehead, right eye, and right ear and suffered abrasions, scrapes, and bruises to the neck and chin area that were consistent with choking. Dr. Mileusnic-Polchan concluded that stab wounds were the primary cause of death.

Dr. Mileusnic-Polchan concluded, based upon the condition of the victim's body, that the time of death was more than one day before the victim was found. The victim displayed defensive wounds on her right hand. Dr. Mileusnic-Polchan concluded that the stabbing occurred when the victim was on or around the bed, that the victim could have been upright when the incident occurred, and that most of the stab wounds were inflicted when the victim was lying down. She noted that the bedroom did not contain much blood due to the nature of the stab wounds and said that tissue tended to close slightly once a knife was removed, causing internal bleeding, not blood spurts.

The defense recalled Investigator Jeffrey Day who confirmed that Ms. Wells told him that she knew something had occurred on Sunday after the victim's death because the police came to her and the Defendant's apartment. Investigator Day agreed Detective Stiles believed the Defendant and Ms. Wells created alibis for each other.

Upon this evidence, the Defendant was convicted of second degree murder and received a twenty-four-year sentence. This appeal followed.

## I.      Motions to Dismiss

The Defendant filed multiple motions to dismiss the indictment, which the trial court denied. The motions relevant on appeal relate to the loss or destruction of the physical evidence, to violations of the Defendant's due process right to a fair trial because of the pre-indictment delay, and to a violation of his right to a speedy trial.

### A.      Destruction of Evidence & Pre-Indictment Delay

The Defendant sought a dismissal of the indictment pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), based upon the destruction or loss of the physical evidence collected at the crime scene in 1986. In a separate but related motion to dismiss the indictment, the Defendant argued that his due process right to a fair trial had been violated because of the extensive pre-indictment delay. He asserted that the pre-

indictment delay resulted in the loss of exculpatory evidence and the unavailability of many witnesses, who had died since the offense.

At the motion hearing, the parties stipulated that on September 14, 1986, evidence was obtained by law enforcement at the victim's home but was at an unknown date lost or destroyed. The missing evidence included a lockbox and its contents, a vacuum cleaner bag with its contents, hairs and fibers, a cassette with latent fingerprints, the victim's nightgown and undergarments worn at the time of her death, clothes the victim wore before changing into her undergarments on the night of the murder, and a pocketknife and miscellaneous keys. The parties also stipulated that additional evidence obtained during the investigation was lost or destroyed, which included a red plastic knife found near the victim's home, a knife obtained from the Defendant's home, and the recording of the Defendant's 9-1-1 call. The parties stipulated that the only photographs maintained by the police that showed the missing evidence depicted the victim in her nightgown, the lockbox and its cylinder, the cassette that was taped to a car window, and the vacuum. The parties stipulated that no analysis of the physical evidence was performed, except that latent fingerprints were removed from the cassette, lockbox, and vacuum and that the knife obtained from the Defendant was negative for the presence of blood.

The parties stipulated Todd Haskett, Detective Tommy Stiles, Carl Ervin, Dale Goin, and David Nave were deceased at the time of the proceedings, although they were relevant trial witnesses. Likewise, although the following witnesses were interviewed by the police, no recording of the interviews existed: David Nave, Kevin Wilkes, Doug Giles, Rex Allen Ervin, Larry Gilland, Carl Ervin, Nancy Ervin, Paul Yarber, Charles Hope, Randy David, David Day, Susan Breeding,[2] Jeffery Scott Massey, Greg Holt, and Carla Tidmore. The parties stipulated that Shannon Wells, David Nave, Carl Ervin, Tony Gray underwent polygraph examinations, that the police file indicated some of the questions asked and the examiner's findings, and that the recordings were not available.

Defense counsel argued that all of the physical evidence obtained during the 1986 investigation had been lost or destroyed. Counsel noted that the forensic evidence could have been tested for the presence of DNA based upon scientific advancements since the killing and discussed the deaths of numerous witnesses. Counsel argued that the Defendant's alibi witness, Ms. Breeding, who would have placed the Defendant at a convenience store at the time of the killing, had died the previous year. Counsel noted that Ms. Breeding provided her statement to Detective Stiles and that Ms. Breeding's testimony would have contradicted Shannon Wells's proposed trial testimony. Counsel contended that the lost evidence, in conjunction with the deceased witnesses, deprived the Defendant of his right to a fair trial.

---

[2] The witness's name appears in the record as Susan Breeding and Susan Breeden. We use Breeding for consistency.

Walter Davis, an investigator for the public defender's office, testified that he interviewed Frank Denny, the victim's next-door neighbor, who could not recall any details about the night of the killing. Mr. Denny reported that he recalled providing the police with a statement, that he did not recall the substance of his statement, and that whatever he told the police at the time of the killing was accurate. At the time Mr. Davis spoke with Mr. Denny, Mr. Denny could not recall what cars, if any, were parked at the victim's home. Mr. Denny recalled, though, that the Defendant and his friends frequented the victim's home.

Detective Tommy Stiles's investigative report detailed the detective's investigation between September 14, 1986 and October 3, 1986. In relevant part, the report noted that latent fingerprints were taken from the metal lockbox found in the victim's bedroom but that the fingerprints did not belong to the victim, the Defendant, or Ms. Wells.

A transcript of Detective Stiles's interview of Jean Weaver reflected that Ms. Weaver stated the victim feared the Defendant and thought the Defendant was going to kill her. Ms. Weaver discussed the victim's relationship with David Nave and said the victim was planning to end the relationship because the victim did not love Mr. Nave, although the couple had a good relationship. Ms. Weaver said that although Mr. Nave wanted a serious relationship, the victim only wanted a casual relationship and that the victim felt comfortable enough with Mr. Nave to discuss with him the problems she was having with the Defendant. Ms. Weaver recounted the victim's finding the Defendant and his wife using cocaine in the victim's home, the victim's throwing away the drugs, and the Defendant's becoming angry. Ms. Weaver recalled another incident in which the Defendant became angry, choked the victim, and broke the victim's vacuum cleaner. Ms. Weaver stated that the victim discussed finding another place to live in an effort to avoid the Defendant.

Ms. Weaver stated that anytime the Defendant became angry with the victim, the Defendant always "knocked her around" and said the victim should have been the person who died, not the Defendant's father. The victim told Ms. Weaver that the Defendant struck the victim numerous times. Ms. Weaver said the Defendant always wanted money from the victim and became angry when the victim did not provide it. At some point, the Defendant took a few bonds from the victim's home without her permission. The victim confronted the Defendant and attempted to explain that although the Defendant's name was on the bonds, the bonds became solely his upon her death. Ms. Weaver said the victim stored the bonds in the glove compartment of the victim's car after the incident, which was consistent with Detective Stiles's finding the bonds in the victim's car.

The trial court denied the Defendant's motion to dismiss relative to the lost or destroyed evidence and portions of the police investigative file from the initial investigation. The court determined that the State had no duty to preserve the lost or

destroyed evidence. Relative to the vacuum cleaner bag, hair, and fibers that were collected and lost, the court found that no evidence showed the items possessed "apparent exculpatory value" and that even if Mr. Nave's DNA was found on the items, such evidence would not have exculpated the Defendant because Mr. Nave had been dating the victim and had been inside the victim's home. Relative to the cassette found taped to the victim's car and apparently left by Mr. Nave, the court found that no evidence showed the cassette possessed exculpatory value. Relative to the remaining missing evidence, the court found the items possessed "no readily apparent exculpatory value." The court noted that no evidence showed that the victim's clothes contained DNA evidence and that any DNA from Mr. Nave would have had little significance because of his relationship with the victim. The court found that relative to the lockbox, the knife from the victim's home, the knife obtained from the Defendant, and the keys and pocket knife from the victim's home, no evidence showed the items possessed any apparent exculpatory value or were material to the defense. As a result, the court concluded that the lost evidence was not constitutionally material.

The trial court determined that no evidence showed why or how the evidence was lost or destroyed and noted that it was not surprising evidence would have been lost during a twenty-five-year period. The court found, though, that the State's failure to maintain the evidence was negligent and that the negligence weighed in favor of the Defendant.

The trial court found that the portions of the police investigative file showed that "subsequent testing and investigation demonstrated a lack of either inculpatory or exculpatory information." The court noted that some of the items were negative for fingerprints and that the knife obtained from the Defendant was negative for blood. The court said the hairs and fibers were of little value. The court found that based upon the defense theory that Mr. Nave committed the offense, the fibers and hairs were of little significance because Mr. Nave had been inside the victim's home. The court noted that none of the missing items were the basis for the charge against the Defendant.

The trial court determined that the State's case was based almost entirely upon the Defendant's former wives' statements to the police and that the remaining evidence, including the lost evidence, had comparatively little value. The court noted that the defense had sufficient information to cross-examine the witnesses and determined that the Defendant had not been denied his right to a fair trial, despite the lost or destroyed evidence.

The trial court also denied the Defendant's motion to dismiss on the basis that the Defendant's due process rights were violated by the extensive pre-indictment delay. In analyzing the factors delineated in *State v. Gray*, 917 S.W.2d 668 (Tenn. 1973), and *State v. Utley*, 956 S.W.2d 489 (Tenn. 1997), the court found that the twenty-six-year delay between the victim's killing in 1986 and the commencement of prosecution in 2012 was

sufficient to raise due process implications. Relative to prejudice created by the delay, the court noted that the Defendant argued he was prejudiced because of the lost memory of witnesses, lost exculpatory testimony as a result of witnesses' deaths, and lost evidence. The court noted that Dale Goin's investigative report reflected that Frank Denny saw a car at the victim's home around that time of the killing and that Mr. Denny thought the car belonged to David Nave, the victim's boyfriend. Mr. Denny could not recall this statement when interviewed by Mr. Goin in 2012. The court found that although Mr. Denny's statement to Mr. Goin might "potentially place" another person at the victim's home, the loss of the evidence was "only slightly prejudicial" in the context of a due process claim. The court found that other "sources of information" showed the victim and Mr. Nave were dating at the time of the killing. Likewise, the court noted that Mr. Goin's report reflected that Mr. Denny never saw Mr. Nave enter or leave the victim's home and that Mr. Denny only saw the car in the driveway around 10:00 a.m. the day after the killing. The court found that any testimony Mr. Denny could have provided had slight significance and that Mr. Denny's memory might have been refreshed upon questioning at the trial.

Relative to the witnesses who had died since the initial investigation, the trial court found that no recording of their police interviews existed. The court found, though, that the Defendant failed to show any prejudice and that the Defendant had presented "mere speculation" about the information possessed by the relevant witnesses.

Relative to whether the delay in the proceedings was intentional or whether the State had a reckless disregard for the prejudicial effect of the delay, the court concluded that the Defendant was not entitled to relief. The court found that the Defendant was the sole suspect at the time of the offense and remained the sole suspect. The court found that the State decided not to seek criminal charges against anyone at the time of the killing, that the investigation stalled, and that the investigation was not renewed until 2011. The court found that it was during the subsequent investigation that the State obtained statements from the Defendant's former wives implicating the Defendant in the victim's death. The court stated, "In plain and simple language, the State did not have sufficient evidence to prosecute the Defendant for 25 years, even if they had wanted to do so." Therefore, the court found that the delay was caused by the police having insufficient evidence and that the State promptly obtained an indictment after the new evidence was obtained. The court found that the delay was reasonable under the circumstances, not the result of the State's attempting to obtain a tactical advantage.

## 1. Lost or Destroyed Evidence

The Defendant contends on appeal that the trial court erred by denying his motion to dismiss. He argues that the hairs and fibers, the victim's clothes, and the lockbox were not examined by the defense, that the evidence could have been analyzed for the presence of DNA with scientific advancements, and that the evidence was necessary for trial

preparation. He maintains that had he been able to analyze the evidence for fingerprints and DNA, possible suspects could have been identified, including Mr. Nave, a burglar, or another unknown person. The State contends that it did not have a duty to preserve the evidence, that the evidence had no apparent exculpatory value, and that the evidence was constitutionally "insignificant."

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Our supreme court has held that the State has a duty to preserve discoverable evidence when the evidence

> might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)); *see* Tenn. R. Crim. P. 16 (discoverable evidence); *see also State v. Merriman*, 410 S.W.3d 770, 779 (Tenn. 2013). The supreme court has said that the proper inquiry involves, first, determination of whether the State had a duty to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. This duty to preserve applies to "potentially exculpatory" evidence. *Merriman*, 410 S.W.3d at 793 (citing *Ferguson*, 2 S.W.3d at 917). If the State failed to fulfill the duty, three factors must be considered:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* The supreme court has said that in evaluating these factors:

> [T]he central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

*Id.* A trial court's application of the *Ferguson* factors involves a constitutional issue, and our supreme court has concluded that the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo. *Merriman*, 410 S.W.3d at 791.

The record reflects that the physical evidence obtained at the crime scene was lost or destroyed for an unknown reason and at an unknown time. The only forensic evidence obtained from the items seized was latent fingerprints from the cassette, lockbox, and vacuum cleaner. The latent fingerprints obtained from the metal lockbox found in the victim's bedroom did not belong to the victim, the Defendant, or the Defendant's then-wife Shannon Wells. Also, no blood was detected on a knife, and it was not considered the murder weapon. The remaining evidence was not analyzed before it was lost or destroyed.

The defense argued that the seized evidence could have been further analyzed due to scientific advancements in DNA technology since the time of the killing. The Defendant's theory of the case was that someone other than the Defendant entered the home and killed the victim. As the Defendant argues in his brief, one potential suspect was Mr. Nave, who was romantically involved with the victim at the time of her death. Witness statements reflect that the victim was thinking of ending her relationship with Mr. Nave, and the police investigation showed Mr. Nave taped a cassette to the victim's car on the night of the killing. Other potential suspects included a burglar, based upon recent burglaries in the victim's neighborhood, and an unknown person who had no connection to the burglaries. Although the trial court correctly found that forensic evidence of Mr. Nave's presence inside the victim's home might not have exculpated the Defendant of the victim's homicide because Mr. Nave had previously been inside the victim's home, the presence of Mr. Nave's DNA, or anyone else's DNA, on the victim's clothes or body at the time of her death could have implicated someone other than the Defendant. We note that the victim declined to spend the evening with Mr. Nave on the night of the killing and decided to spend time with Ms. Brown, in whom the victim confided she was thinking of ending the relationship. Any forensic evidence linking anyone, including Mr. Nave, to the clothes the victim wore that night, to her nightgown, or to her body would have been potentially exculpatory evidence. We note that in its

-14-

brief, the State acknowledges the evidence was obtained because it was "possibly significant." It is the potential for exculpatory evidence that triggers, in part, the duty to preserve. *See Merriman*, 410 S.W.3d at 793; *Ferguson*, 2 S.W.3d at 917. Furthermore, the Defendant had no ability to obtain comparable evidence from another source. Any photographs of the items remaining after twenty-six years would not have permitted scientific forensic analyses of the relevant evidence. Therefore, we conclude that the State had a duty to preserve the evidence because the evidence might have shown the presence of DNA belonging to someone other than the Defendant.

Relative to the cassette taped to the victim's car, we note that no evidence shows the investigating officers listened to the cassette before it was lost or destroyed, that the contents of the cassette are unknown, and that it is impossible to determine whether the evidence exculpated or inculpated the Defendant or anyone else. Because the investigating detective did not listen to the cassette or document its contents, it is problematic to conclude that the cassette did not possess any evidentiary value. It is likewise problematic to determine the cassette did not possess exculpatory evidence without knowing its contents. A conclusion that the cassette has no value when it is impossible to know what evidence, if any, the cassette contained is illogical and invites the potential for police misconduct.

Regarding the remaining *Ferguson* factors, the State concedes that it was negligent in failing to maintain the evidence after it was seized, and the trial court properly found that the State was negligent in this regard. *See Ferguson*, 2 S.W.3d at 917 n.10 (stating that negligence is presumed from lost evidence). Relative to the significance of the lost or destroyed evidence, we note again that had the evidence been preserved, it might have shown forensic evidence connected to the Defendant or to someone else. Although the original police file noted that "subsequent testing and investigation demonstrated a lack of either inculpatory or exculpatory information," the record only reflects that some latent fingerprints were obtained, none of which belonged to the Defendant, and that some items were analyzed for the presence of blood. None of the items were analyzed for blood type. Also, scientific advancements in the area of DNA evidence might have revealed additional information on those items previously examined and on evidence never analyzed by law enforcement. Although the court found that the hairs and fibers were of little value, the court did not explain the basis for its finding. We acknowledge, though, that other evidence showed the Defendant's car at the victim's home around the time of the killing, that the Defendant was violent toward the victim, that the victim was scared of the Defendant, and that the victim, to a certain extent, controlled the Defendant's trust fund, which evidence showed was a source of contention between the victim and the Defendant. We conclude that the lost or destroyed evidence had some significance.

Relative to the sufficiency of the convicting evidence, we conclude that none of the evidence was used during the State's case-in-chief. The State's case centered on the Defendant's incriminating statements to his former wives and to Julio Allen. Mr. Allen testified that the Defendant reported stabbing the victim five to six times, staging the victim's home to look as though a robbery had occurred, and killing the victim for life insurance proceeds. Ms. Hoslinger, the Defendant's second wife, testified that the Defendant admitted killing the victim inside her bedroom after she changed into her nightgown and admitted opening the laundry room window and rummaging through the home to make it look as though a burglary occurred. These statements were corroborated by the medical examiner's testimony regarding the stab wounds, by photographs of the crime scene, by Officer Gilland's testimony about the Defendant's suggesting the killing occurred during a burglary and asking the officer to look at the opened laundry-room window, and by the victim's life insurance policy reflecting the Defendant was the beneficiary. We note, though, that the defense cross-examined Mr. Allen and the Defendant's former wives, highlighting their inconsistent statements and motives to provide untruthful testimony against the Defendant.

Upon balancing these factors, we conclude that the lost or destroyed evidence implicated the Defendant's right to a fundamentally fair trial. The question becomes one of the proper remedy to preserve the Defendant's right to a fair trial. In this regard, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to dismiss the indictment because the relevant evidence was not used to implicate the Defendant in the victim's killing, because the remaining evidence was sufficient to support the conviction, and because the Defendant possessed sufficient information to impeach the credibility of the State's primary witnesses. We note that after the defense's closing argument, a bench conference was held in which the trial court told counsel that it had omitted the *Ferguson* jury instruction regarding the duty to preserve evidence. Upon revising the final jury instruction to include the duty to preserve evidence, however, defense counsel was permitted to address the issue in his closing argument before the State's rebuttal closing argument. The record reflects that the court provided the pattern jury instruction regarding the State's duty to gather and preserve evidence. *See* T.P.I.— Crim. 42.23 (19th ed. 2015).

The jury was aware the police collected but lost potentially important evidence, and the jury's verdict reflects it credited the witness testimony regarding the Defendant's admissions and incriminating statements despite the lost evidence and the defense's impeachment of the witnesses. A dismissal of the indictment was not required in order to protect the Defendant's right to a fundamentally fair trial. The Defendant is not entitled to relief on this basis.

## 2. Pre-Indictment Delay

Although the Defendant argued before the trial court that the *pre-indictment* delay violated his due process right to a fair trial, he frames the argument in his appellate brief as a violation of his Sixth Amendment right to a speedy trial because of a *pretrial* delay. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972); *State v. Baker*, 614 S.W.2d 352, 355 (1981). However, the record reflects that the Defendant did not assert his Sixth Amendment right to a speedy trial in his motion to dismiss or at the motion hearing and that the trial court did not render a judgment regarding a speedy trial violation. Rather, the Defendant contended that his due process right to a fair trial had been violated by the extensive pre-indictment delay because of the lost or destroyed evidence and the deaths of potential trial witnesses. We note that a pre-indictment delay does not violate a defendant's Sixth Amendment right to a speedy trial. *See State v. Dykes*, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990). In any event, we consider only whether the Defendant's due process right to a fair trial was violated by the pre-indictment delay. To the extent that the Defendant argues that a speedy trial violation occurred, the issue is waived because it was not raised in the trial court. *See* T.R.A.P. 36(a).

The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 8 of the Tennessee Constitution provide a criminal defendant with the right to due process. A delay between the commission of an offense and the initiation of formal proceedings may violate the right to due process. *State v. Gray*, 917 S.W.2d 668, 671 (Tenn. 1996).

> Before an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused.

*Dykes*, 803 S.W.2d at 256; *see State v. Utley*, 956 S.W.2d 489, 495 (Tenn. 1997); *United States v. Marion*, 404 U.S. 307 (1971). Prejudice to a defendant is the most critical factor. *State v. Gilley*, 297 S.W.3d 739, 755 (Tenn. Crim. App. 2008).

The record reflects that the offense occurred in September 1986 but that the Defendant, who was the sole suspect from the time of the killing, was not indicted for first degree murder until April 2012. The Defendant has established a lengthy pre-indictment delay that implicates the due process right to a fair trial.

Relative to prejudice to the Defendant as a result of the delay, the record establishes that the physical evidence was lost or destroyed, some of which was never analyzed and some of which was only analyzed for the presence of blood and latent fingerprints, and that the defense was unable to analyze this evidence to support its theory

-17-

that someone other than the Defendant killed the victim, most notably Mr. Nave or an unknown assailant. Likewise, the parties stipulated that multiple people had died during the pre-indictment delay, including Detective Tommy Stiles, the original investigator, Mr. Nave, the victim's boyfriend, Dale Goin, the victim's family's private investigator, and Todd Haskins, the Defendant's friend who some suspected was involved in the victim's killing. The trial court found that the Defendant was "slightly prejudiced" by the passage of time relative to witnesses who were still living but whose memories had faded. Frank Denny told the police at the time of the killing that he thought he saw Mr. Nave's car at the victim's home the day after the killing but could not recall providing this information to the police when he was interviewed by Mr. Goin in 2012. The court correctly found that Mr. Denny never told the police that he saw Mr. Nave enter or leave the home on the night of the killing and that even if Mr. Denny's memory could have been refreshed, any testimony had only slight significance. Relative to the witnesses who had died since the initial investigation, the trial court found that no recording of their police interviews existed. The court found, though, that the Defendant failed to show any prejudice and that the Defendant had presented "mere speculation" about the information possessed by the relevant witnesses.

In any event, the Defendant failed to establish that the pre-indictment delay was caused by the State in order to gain tactical advantage over or to harass the Defendant. The record supports the trial court's finding that the cause of the delay was insufficient evidence to charge the Defendant for the victim's killing. The Defendant was the sole suspect at the time of the offense and remained the sole suspect until the Defendant was indicted in 2012. The court found that it was not until the subsequent investigation beginning in 2011 that the State obtained statements from the Defendant's former wives implicating the Defendant in the victim's death. The court stated, "In plain and simple language, the State did not have sufficient evidence to prosecute the Defendant for 25 years, even if they had wanted to do so." We conclude that the State did not intentionally or with reckless disregard delay obtaining an indictment in order to obtain a tactical advantage or to harass the Defendant. As a result, he is not entitled to relief on this basis.

### B.      Pre-Indictment Delay & Right to a Speedy Trial

The Defendant also sought a dismissal of the indictment on the ground that his due process right to a fair trial had been violated because the pre-indictment delay resulted in the death of his alibi witness. In the same motion, the Defendant asserted that his right to a speedy trial had also been violated. In support of his motion, he argued that the death of his potential alibi witness, along with the lost evidence and the passage of twenty-seven years, deprived him of the ability to obtain a fair trial. The motion did not specifically address the alleged speedy trial violation.

-18-

At the motion hearing, defense counsel stated that Susan Breeding contacted Detective Stiles, the original investigator, about the victim's killing. Ms. Breeding told Detective Stiles that she worked at a convenience store near the victim's home, that she was working the night of the killing, and that she saw the Defendant at the store between 12:30 and 1:00 a.m. Ms. Breeding recalled that she had to "do a report" from the cash register at 1:00 a.m. and that the Defendant arrived at the store before she created the report and remained there for thirty to forty-five minutes. Ms. Breeding also remembered seeing a woman inside the Defendant's car that night, although Ms. Breeding did not speak to the woman. Ms. Breeding did not report seeing blood on the Defendant's clothes when he was at the store. Defense counsel argued that Ms. Breeding's statement to Detective Stiles created an alibi and refuted Ms. Wells's proposed trial testimony that the Defendant came home covered in blood and left on the night of the killing. Counsel argued that Ms. Breeding's death, along with the lost or destroyed evidence, deprived the Defendant of his right to a fair trial.

The prosecutor noted for the trial court that Ms. Breeding died in February 2013, that this case was scheduled for trial on October 1, 2012, and that the trial was rescheduled to July 22, 2013. The prosecutor argued that Ms. Breeding died between the scheduled trial dates, that the State had no control over Ms. Breeding's dying, and that the delay in the proceedings was not obtained in an effort to obtain a tactical advantage in the case. The prosecutor offered to stipulate that had Ms. Breeding been available to testify at the trial, her testimony would have been the contents of her statement to Detective Stiles in 1987.

Defense counsel noted relative to the delay in the proceedings that counsel did not represent the Defendant at the time of the previous trial date but that he recalled the delay was the result of the State's charging the Defendant with solicitation to commit murder, which created a conflict of interests for the District Public Defender's Office, which represented the Defendant earlier during the proceedings. Relative to reading Ms. Breeding's statement at the trial, counsel argued that the prosecutor would probably not agree to read the statements of the State's witnesses. Counsel argued that reading Ms. Breeding's statement placed the defense at a disadvantage because the State's case would be based upon live testimony, that reading a statement did not have the same impact as live testimony, and that the jury would have been unable to evaluate Ms. Breeding's credibility by observing her during testimony.

The trial court denied the motion. The court found that although the victim was killed on September 12, 1986, and the Defendant was the primary suspect, no charges were filed against the Defendant until April 2012. The court found that in 2011, new evidence was discovered from the Defendant's former wives, who claimed that the Defendant confessed to killing the victim. The court found that a police report from the original investigation contained a summary of Detective Stiles's interview of Susan Breeding approximately four months after the killing. The court found that Ms. Breeding

told the detective that she saw the Defendant at a convenience store on the night of the victim's death. Ms. Breeding recalled that a woman was inside the Defendant's car and that the Defendant referred to the woman as "his old lady." Ms. Breeding assumed the woman was Ms. Wells. Ms. Breeding recalled seeing the Defendant between 12:30 and 1:15 a.m., which was the time the killing was believed to have occurred. The court found that the report reflected that although Ms. Breeding stated she read about the killing in the Sunday newspaper, the victim's body was not discovered "in time to be in" Sunday's newspaper. The court found based upon the report that Ms. Breeding's statement was not credible, that she was incorrect or dishonest about how she remembered the date, and that the Defendant's friend, who was involved romantically with Ms. Breeding, requested she contact the police. The court found that Ms. Breeding died in February 2013.

The trial court found that the twenty-six-year delay between the date of the offense and the Defendant's 2012 indictment was sufficient to raise due process implications. Relative to prejudice to the Defendant, the court found that although Ms. Breeding was alive when and after the indictment was returned, no statements directly from Ms. Breeding existed and that the only statement reflecting the possible substance of what Ms. Breeding's trial testimony would have been was Detective Stiles's summary of her statement. The court found that Ms. Breeding could have provided a partial alibi for the Defendant and could have contradicted Ms. Wells's statement about the night of the killing. The court found that the Defendant had suffered "some degree" of prejudice.

Relative to the cause of the delay, the trial court found that the Defendant was the sole suspect in the original investigation, that the Defendant remained the sole suspect after the last evidence was collected in 1987, and that the State decided not to seek criminal charges against the Defendant. The court found that the investigation stalled until a request to move the victim's body renewed interest in the investigation and that new evidence in the form of witness statements implicating the Defendant was obtained during the subsequent investigation in 2011. The court found that without the witness statements from the Defendant's former wives, it was unlikely the Defendant, or anyone, would have been charged for the victim's killing. The court found that the State did not have sufficient evidence to prosecute the Defendant for more than twenty-five years, that the delay in charging the Defendant was caused by a lack of sufficient evidence, and that an indictment was obtained promptly after the new evidence was discovered. The court found that the delay was not an effort to obtain a tactical advantage and that the State had a justifiable reason for delaying the prosecution. The court found that Ms. Breeding did not die until nearly one year after the Defendant was indicted and that the pre-indictment delay did not result in the loss of the alibi witness. The court found that Ms. Breeding was age fifty-five at the time of her death and that the State could not have anticipated her death before a trial could be held. The court determined that the Defendant's due process right to a fair trial had not been violated because of the pre-indictment delay.

Relative to the speedy trial violation alleged but not discussed in the Defendant's written motion or at the motion hearing, the trial court found that the defendant only alleged a pre-indictment delay. The court concluded that the Defendant could not raise a speedy trial violation on the basis of a pre-indictment delay.

On appeal, the Defendant frames the issue as whether the trial court erred by denying his "motion to dismiss due to the death of his alibi witness, Susan Breeding . . . denying him a fair trial." However, the legal authority cited in the Defendant's appellate brief is relevant to the Sixth Amendment right to a speedy trial. The transcript of the motion hearing reflects that counsel did not address a speedy trial violation and that the Defendant's basis for asserting his due process rights were violated was a pre-indictment delay. Counsel's argument was limited to whether the Defendant could obtain a fair trial without Ms. Breeding's testimony. The trial court properly concluded that the Defendant could not raise a speedy trial violation based upon a pre-indictment delay. *See Barker*, 407 U.S. at 530; *Baker*, 614 S.W.2d at 355. Therefore, we consider only whether the Defendant's due process right to a fair trial was violated. To the extent that the Defendant argues that a speedy trial violation occurred, the issue is waived because it was not litigated in the trial court. *See* T.R.A.P. 36(a).

We have previously concluded that an extensive delay occurred between the date of the killing and the return of the indictment. Relative to prejudice, Ms. Breeding was a potential alibi witness, who could have placed the Defendant at a location other than the victim's home around the time of the killing and who could have contradicted Ms. Wells's testimony regarding the night of the killing. Although we question the trial court's ability to make credibility determinations from a document in which Ms. Breeding's statement was summarized by the original investigating officer, who was also deceased at the time of the proceedings, the substance of her statement near the time of the killing was material and relevant to the identity of the perpetrator. We note that although Ms. Breeding's statement might have contained inconsistencies regarding when she might have read a newspaper article about the victim's killing, her statement was provided at least four months after the offense. The loss of her testimony created prejudice. However, Ms. Breeding's death occurred after the indictment was obtained by the State and after the initial trial date. Ms. Breeding did not die during the pre-indictment delay, and therefore, the Defendant cannot establish the prejudice he sustained was the direct and proximate result of a pre-indictment delay that deprived him of his due process right to a fair trial. Although the trial was allegedly rescheduled because of a conflict of interests created for the Defendant's previous counsel after the State obtained an indictment against the Defendant for solicitation to commit murder, no evidence shows the pursuit of the indictment was a tactic to delay the proceedings in the present case. Likewise, no evidence reflects the pre-indictment delay was an effort to gain a tactical advantage or to harass the Defendant. As the trial court properly found, the pre-indictment delay was created by insufficient evidence to charge the indictment. As a result, the Defendant is not entitled to relief on this basis.

-21-

## II. Improper Witness Testimony

The Defendant contends that the trial court erred by allowing his former wives to testify about alleged acts of violence against them. He argues the testimony should have been excluded pursuant to Tennessee Rule of Evidence 404(b). The State contends the trial court properly limited the relevant testimony. In a related issue, the Defendant contends that trial court erred by allowing Julio Allen to testify with his jaw wired closed because it "invited the jury to assume the injury was at the hands of the Defendant." The State argues that the trial court properly allowed Mr. Allen to testify.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is abuse of discretion, provided a trial court substantially complies with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

At the evidentiary hearing, Shannon Wells testified that she met the Defendant in December 1985, when she was a junior at an Alabama high school and on a field trip to Sevier County. She and the Defendant began a relationship while she was in Tennessee, and the Defendant came to Alabama after her field trip ended. Ms. Wells recalled that her home life at the time was tumultuous, that the Defendant was a welcomed distraction in Alabama, and that they were inseparable until 1986.

Ms. Wells testified that she and the Defendant wanted to marry but that her parents wanted her to finish high school before they married. Although her parents were adamant that she was too young to marry and needed to finish high school, the Defendant wanted her to return to Tennessee with him and finish school. Ultimately, Ms. Wells and the Defendant fled Alabama without her parents' consent and lived at the victim's home. Ms. Wells's father drove from Alabama to the victim's home and arrived with a police officer. Ms. Wells's father threatened to have the Defendant arrested. Ms. Wells told her father that if he allowed her to marry the Defendant, she would willingly return to Alabama. Ms. Wells and the Defendant married in June 1986 at an Alabama courthouse.

Ms. Wells testified that the day after their wedding, she and the Defendant left for Tennessee but that before leaving, she and the Defendant went to her mother's home. While they were at Ms. Wells's mother's home, the Defendant read a note in Ms. Wells's school yearbook written by someone she identified as Lee. Ms. Wells said that she thought of Lee as a brother, although Lee had romantic feelings for her and that Lee had written, "[Y]ou really f----- up now. I hope you're happy. He's not the right one . . . I can't believe you . . . chose to do this and . . . you'll see that he's not the right one . . . I'll always love you." Ms. Wells recalled that the Defendant's demeanor changed before they left Alabama and that during the drive, the Defendant stopped the car on the side of the road, pulled her out of the car, punched her "like a man with his fists," and said she had looked at men in the passing cars while they traveled. Ms. Wells said the Defendant told her that he read Lee's note in her yearbook, that she was a "w----," that they were married, that he owned her, and that she "better not . . . look[] at anyone else again." Ms. Wells said that afterward, the Defendant placed her in the car. Ms. Wells said that she was bleeding, was shocked, and did not understand what had occurred. The Defendant apologized later and said he did not know what was wrong with him.

Ms. Wells testified that she and the Defendant lived with the victim for a few weeks before moving into an apartment. She said that after they moved, the Defendant became consistently violent. She said she attempted to avoid confrontations by doing what the Defendant requested of her. She said the Defendant used cocaine and marijuana frequently. She said the frequency of the assaults gradually increased from once per week to daily. She said eventually she decided not to defend herself or cry because those things only made the assaults worse. She said she was hospitalized twice because of the assaults. She described one incident of sexual assault by the Defendant and his friend, whom she identified as Todd.

Ms. Wells testified that the Defendant frequently threatened her with knives, that the Defendant "played" with a pocket knife in an effort to scare her, and that the Defendant threatened her with the knife while laughing and telling her nobody would find her body. She said the Defendant took the telephones from their apartment when he left and secured the apartment in such a manner that she would have only been able to leave by breaking a window. She said that although the Defendant allowed her to call her

family once per week, the Defendant told her what to say. She said she never left the apartment.

Ms. Wells testified that the Defendant was hateful and condescending toward the victim and that the Defendant blamed the victim for his father's suicide. Ms. Wells recalled one incident in which the Defendant refused to help the victim retrieve groceries from the victim's car. Ms. Wells said that the Defendant told the victim it was the victim's job to bring the groceries inside and that the Defendant threw canned food at the victim because the victim did not get the brand he requested. Ms. Wells said that the Defendant punched the walls and that the victim ran to her bedroom. Ms. Wells said the Defendant argued frequently with the victim about money because the victim would not grant his requests for money beyond his monthly allowance from his trust fund. Ms. Wells said the Defendant cursed and threw things at the victim when they argued about money. Ms. Wells said that the Defendant talked about the bonds the victim kept inside a lockbox and that the Defendant believed the victim simply did not want him to have them.

Ms. Wells testified that the Friday before the victim's body was discovered on Sunday, the Defendant had been gone from home all day. She said that the Defendant and Todd came home very late, that the Defendant was agitated and paced the floor, and that Todd mumbled incoherently. She heard the Defendant tell Todd to be quiet in order for the Defendant to think and said, "The b---- made me do it." Ms. Wells saw blood on the Defendant's shirt and pants and asked the Defendant what happened. She said the Defendant shoved her and told her to be quiet. She said the Defendant washed his hands, changed his clothes, gathered cleaning supplies, and left with Todd. She said the Defendant returned before the sun rose and went to bed immediately. She said that when he awoke, he made several telephone calls and announced he was leaving to "play ball." Ms. Wells learned "shortly after[ward]" that the victim was dead.

Ms. Wells testified that after the victim's body was discovered, the Defendant told her to tell the police that they were fishing when the killing occurred. She and the Defendant returned to the victim's home days after the killing, and Ms. Wells said the Defendant was nonchalant and went through the home gathering items he wanted. She said the Defendant ordered her to clean the victim's bedroom. She recalled one incident afterward in which the Defendant threatened her with a knife. She said that the Defendant placed a knife on her throat and that he stated, "If you ever tell anybody . . . you know what happened to my mother, and she was my mother, do you think I would hesitate with a w---- like you." She said the Defendant also threatened her family. She said, though, the Defendant became loving toward her until the victim's funeral. She said that after the funeral and the police questioned them, the Defendant returned to assaulting her. She said she was terrified and returned to Alabama about two weeks after the victim's death. She said she remained terrified of the Defendant.

-24-

Ms. Wells testified that she returned to Knoxville in December 1986 to talk to the police and that she reported the Defendant was not with her when the victim was killed. She did not tell the police about the blood on the Defendant's clothes. She said she did not tell the police the details of the night the victim was killed until 2011 because she feared the Defendant. She said that she continued having periodic nightmares and panic attacks. She said that the trauma she suffered from the Defendant impacted her marriage to her son's father and that they divorced when her son was one year old. She said that when Investigator Day contacted her, her son was an adult and not living at home and that she was less concerned the Defendant might attempt to hurt her or her family.

Ms. Wells testified that after she permanently returned to Alabama, she obtained her GED and began working at Walmart. She said that about two months later, she received a telephone call at work. She said it was the Defendant, who said, "[D]id you think that I wouldn't be able to find you, there's nowhere that you can go that I won't know where you're at." She said she ended the call.

On cross-examination, Ms. Wells testified that she did not have anxiety attacks when she and the Defendant were married and denied that she was hospitalized for an anxiety attack. She said her hospitalizations were the result of the Defendant's abuse. She agreed she did not tell the social worker at the hospital that the Defendant struck her and said the Defendant was present when the social worker entered her hospital room. She said she was scared of the Defendant. She said she would have been surprised if her 2011 police statement did not include her telling Investigator Day that the Defendant and Todd sexually assaulted her on one occasion.

Ms. Wells testified that when her family arrived at her and the Defendant's apartment to take her to Alabama, her family had to use a crowbar to pry open the exterior lock and that she begged her family not to tell anyone. She agreed that during one of her hospitalizations, she called the victim looking for the Defendant when he had been missing for about one week. She said later, though, that her December 1986 statement reflected the victim called her at the apartment, not the hospital. Although she did not recall, she said it was possible the victim called around 6:30 p.m. Friday on the night of the murder offering her and the Defendant tickets to the fair.

Ms. Wells testified that she did not recall the Defendant's having money problems and that the Defendant received income from the liquor store and his trust fund. After reviewing her December 1986 statement, she recalled telling the police that on Sunday when the victim's body was discovered, the Defendant asked her if she knew where he could find his football and that she told the Defendant it was at his mother's home. She agreed the police arrived at their apartment around 7:00 p.m. Sunday night. She did not recall if the police used a crowbar to open the apartment door and said she did not think the door was locked. She agreed the police found no blood inside their apartment.

Ms. Wells testified that the Defendant's telephone call to her while she was working at Walmart occurred around February 1987. She said that the Defendant also called her mother and aunt several times but could not recall if those calls occurred before or after the Defendant called her at work. She recalled telling the police in 1986 that she believed the Defendant was capable of killing the victim and said she was scared of the Defendant.

On redirect examination, Ms. Wells testified after reviewing her 2011 police statement that she told Investigator Day about the incident alongside the road after she and the Defendant were married and traveling to Knoxville. She agreed that she told Investigator Day about the Defendant's reading her yearbook and becoming angry.

Barbara Ann Holsinger testified that she and the Defendant married in 1990, that they had a daughter in 1991, and that their relationship ended after two years. She said that after they married, the Defendant began beating her daily and preventing her from associating with anyone, including her family. She recalled feeling as though she were a prisoner in her home. She said the Defendant was an alcoholic. She said that although the Defendant apologized after every assault, the beatings became worse. She said that when she was eight months pregnant, the Defendant "beat her baby out of [her]." She recalled that during the incident, she suffered a broken nose, dislodged teeth, and black eyes. She said that she went into labor and that she told the Defendant he was going to kill her if he did not stop hitting her. She said the Defendant responded, "I'll kill you, b----, and get away with it." She said the Defendant admitted killing his mother, stated he would kill Ms. Holsinger, and explained how he killed his mother.

Ms. Holsinger testified that the Defendant said he made his mother's killing look as though someone entered the home through a laundry room window and rummaged through the home. The Defendant told her that he looked for bonds belonging to his father, waited for his mother to return home, hid in a closet, watched his mother change into her nightgown, jumped out of the closet when his mother turned toward the bed, and stabbed his mother. Ms. Holsinger said that although the Defendant had told her these things in 1991, she did not tell the police because the Defendant threatened to kill her and because she feared the Defendant.

On cross-examination, Ms. Holsinger conceded that her labor was induced at the hospital. She said she "signed" herself into "Lakeshore" and reported to the staff she was having thoughts of wanting to kill the Defendant and wanting to throw her baby against the wall. She said the Defendant's admission about his mother's killing came after he drank "a fifth of whiskey." She said that the Defendant reported throwing a lockbox under some bushes outside the victim's home and that she did not know the lockbox was found inside the home. She said the Defendant reported stabbing the victim fifteen or sixteen times. She said she initially did not believe the Defendant killed his mother but

believed him after the domestic abuse became worse. She denied substance abuse problems, although she admitted recreational marijuana use.

Ms. Holsinger testified that she lived periodically with the Defendant in an effort to visit her daughter. She agreed she did not tell anyone during her and the Defendant's divorce proceedings that the Defendant had killed the victim.

Upon questioning by the trial court, Ms. Holsinger testified that the Defendant had been drinking alcohol on the night he admitted killing his mother. She did not recall what angered the Defendant but said that he hit her on the face and that she begged him to stop. She said that while the Defendant was hitting her, he told her that he did not know why he hurt the people he loved, that he would kill her, and that he would "get away with it" because he had not been prosecuted for killing his mother. When confronted on cross-examination with her 2011 police statement in which she said that he made the statements after the physical altercation ended, she said that the Defendant made the statements after the incident and when the Defendant was calm.

The Defendant testified that the incident Ms. Wells described in the car when they were traveling from Alabama to Knoxville never occurred. He said they traveled to Sevierville without stopping and rented a chalet for two days. He admitted causing most of the holes in the walls at his mother's home but denied throwing a canned good at his mother. He said the victim would have called the police immediately if he had thrown something at her. He denied locking Ms. Wells inside their apartment and taking the telephones when he left.

The Defendant testified that Ms. Holsinger smoked crack cocaine when they were married. He recalled one incident a few years previously in which he, Ms. Holsinger, and their daughter met at a restaurant. He said that Ms. Holsinger went to the bathroom and that when she returned, he knew she had consumed some type of narcotic. He said their daughter said, "Mom, you're smoking crack in Waffle House." The Defendant said that their daughter was removed from Ms. Holsinger's custody because the child had been neglected and that he never denied Ms. Holsinger visitation with their daughter.

The Defendant testified that he did not threaten Ms. Holsinger or tell her that he killed the victim. He said Detective Stiles "stopped" him twice and questioned him about the victim's death. The Defendant said he told the detective and Ms. Holsinger what he thought occurred at the victim's home.

On cross-examination, the Defendant testified that during his relationships with Ms. Wells and Ms. Holsinger, he drank alcohol and smoked marijuana, but he denied using cocaine. He denied blaming his mother for his father's suicide. He said relative to his trust fund that he called "Mr. Phillips" if he needed money but that his mother had to approve large disbursements. He said that although he and his mother had

"disagreements," they were not serious. He recalled the victim's throwing a hair dryer at him during a morning rush to get ready for school and work but said the incident was not violent. He recalled the victim's calling the police when she found a small amount of marijuana in his bedroom and said the victim would have called the police had he assaulted her.

The Defendant testified that Detective Stiles intentionally ignored other suspects in the victim's killing. The Defendant denied stealing bonds from the victim's lockbox and said the bonds he took were in his name only. He denied taking bonds that required his mother's signature in order to cash.

The Defendant testified that he did not break into a liquor store and said any story he told when he was in jail was not true. He said that telling "war stories" was part of being in jail and that not all of the stories were true. He said that the burglary of the liquor store was true but that he was not involved. He admitted buying some of the stolen liquor. He described himself as "pretty peaceful," although he had "some issues" with women. He agreed he previously pleaded guilty after an incident in which a woman with whom he was romantically involved became covered in gasoline, although he disputed the facts of the case. He denied ever hitting Ms. Wells but admitted he and Ms. Holsinger had "some fights." He said Ms. Holsinger attempted to stab him and was delusional because of the Xanax she took during their marriage.

On redirect examination, the Defendant testified that he did not believe his father committed suicide and that he could not blame his mother for a suicide he did not believe occurred.

The trial court found relative to Ms. Wells's testimony about the violent incidents the Defendant perpetrated against her that any material issue did not outweigh the danger of unfair prejudice. Relative to the incidents Ms. Wells described in which the Defendant was condescending toward the victim, told the victim that he hated her, blamed the victim for his father's suicide, called her a "f------ b----," argued with the victim regarding money, and told the victim that he would get the money were not criminal prior bad acts as contemplated by Rule of Evidence 404(b). The court found that the evidence related to the Defendant's character but that the danger of unfair prejudice was low compared to the material issue of his relationship with the victim and whether the Defendant had a reason to kill the victim. The court permitted Ms. Wells to testify about the Defendant's behavior towards the victim.

Relative to the Defendant's throwing a canned good at the victim and calling the victim names when she purchased an item the Defendant disliked, the trial court found that this evidence was not material and was outweighed by the danger of unfair prejudice. The court prohibited Ms. Wells from testifying that the Defendant threw the canned good at the victim but allowed her to testify about the Defendant's comments during the

incident. Relative to Ms. Wells's testimony regarding the night of the victim's death and the following days, the court found the evidence was highly probative of the Defendant's attempting to have Ms. Wells establish an alibi and probative of the Defendant's guilt. The court found that the probative value of the evidence of the Defendant's telling Ms. Wells to lie to the police about where he was on the night of the killing, his coming home wearing bloody clothes, and his making her clean up blood inside the victim's home outweighed any danger of unfair prejudice to the Defendant.

The trial court found that Ms. Wells's testimony that the Defendant placed a knife to her throat and said "something to the effect, if I did it to her, I wouldn't hesitate to do it to someone like you" was material and probative and could have been an admission against interests, although it did not rise to a confession. The court found Ms. Wells's testimony credible and clear and convincing on this point. The court found the materiality outweighed any danger of unfair prejudice. The court, likewise, found Ms. Wells's testimony credible and clear and convincing about the Defendant's calling her at work and asking her, "Do you think I wouldn't be able to find you." The court said the testimony was material to explaining why Ms. Wells remained silent for more than twenty-five years. The court found that Ms. Wells's testimony was material to whether the Defendant would have wanted her to remain quiet and not talk to the police after he came home wearing bloody clothes and "confessed to her." The court again found that the probative value of the telephone call to Ms. Wells while she was working outweighed any danger of unfair prejudice.

The trial court summarized that Ms. Wells was permitted to testify about the Defendant's berating the victim, condescending to the victim, arguing with the victim about money, telling Ms. Wells to lie to the police about the night of the killing, coming home wearing bloody clothes on the night of the killing, placing a knife to her throat and saying if he did it to "her," he would not hesitate to do it to Ms. Wells, and calling Ms. Wells at work after she returned to Alabama. The court determined that Ms. Wells could not testify about the Defendant's throwing a canned good at the victim, his drug use, or any additional acts of violence.

Relative to Ms. Holsinger, the trial court determined that her testimony regarding daily beatings and the beating she claimed induced labor were highly prejudicial and outweighed any probative value. Relative to the violent incident in which the Defendant admitted killing his mother, the court found that the evidence was probative of whether the Defendant confessed to killing the victim. Although the trial judge did not credit all of Ms. Holsinger's testimony, he credited her testimony relative to this incident and found clear and convincing evidence existed to show the Defendant made the statement. The court considered how to limit the testimony that the Defendant's statement occurred during the course of a physical altercation and determined that Ms. Holsinger's stating that the Defendant was going to kill her if he did not stop attacking her was relevant and probative of explaining the complete account of the incident between the Defendant and

-29-

Ms. Holsinger. The court permitted her to testify that the Defendant was being physically violent and that the probative value of the testimony outweighed the danger of unfair prejudice. The court also permitted Ms. Holsinger to testify about the Defendant's comments the following morning that he made the victim's killing look like a robbery. The trial court prohibited Ms. Holsinger from testifying about any other violent incidents, the Defendant's drug use, and the Defendant's alcohol intoxication because the court determined it was irrelevant and immaterial.

## A.    Ms. Wells

In his appellate brief, the Defendant states that the issue is whether the trial "court erred in allowing in testimony of alleged violence towards his two ex-wives inviting a conviction based on conformity with some alleged violent tendency." However, he argues the following in its entirety regarding Ms. Wells:

(1)    beaten in the face on Friday Sept. 12, 1986
Struck in the face Saturday Sept. 13, 1986
Interviewed by police Sunday Sept. 14, 1986 and gives an alibi for their only suspect And NOBODY mentions any bruises or marks?

(2)    Locked in the apartment by Billy whenever he left the apartment:
Billy leaves Sunday Morning. Reports finding mom. Taken to KPD.
KPD shows up to talk to Shannon that evening.
        No mention of having to BREAK in to get her.

(3)    Not only does he lock her in but he takes the phone with him
She tells them that Billy had been missing for a couple of day[s] the week before the murder. She called his mother or her mother called her because they were both worried about him. How did she do that if Billy had the phone?

(4)    Billy will kill her if she tells.
She leaves in November of 1986. Says Billy called a couple of times and was hung up on. Didn't see or hear from him again. Not for 25 years. Her "fear" if indeed it existed, was irrational.

She was a 17 year old who ran away. Then 3 months into their marriage the authorities declare her new prince is a murderer. None of that testimony is clear and convincing. Nor is it more probative then prejudicial.

-30-

The Defendant does not cite to the record regarding the relevant portion of Ms. Wells's trial testimony or the violent incident about which she testified. Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires that an appellant's argument contain "citations to the authorities and appropriate references to the record . . . relied on." The rules of this court provide, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]" Tenn. Ct. Crim. App. R. 10(b). Notwithstanding the deficiency in the Defendant's brief, we will consider the issue. We caution counsel, however, that appellate review is frustrated by the failure to identify the basis in the record for the argument presented and that compliance with the Rules of Appellate Procedure is expected.

To the extent that the Defendant challenges any testimony regarding the Defendant's abusing Ms. Wells in the days immediately days before and after the victim's killing, the record reflects that Ms. Wells provided no such testimony at the trial. Likewise, Ms. Wells did not testify that the Defendant locked Ms. Wells inside their apartment and took the telephones with him before leaving. We note that the trial court limited Ms. Wells's testimony in this regard to the Defendant's berating the victim, condescending to the victim, arguing with the victim about money, telling Ms. Wells to lie to the police about the night of the killing, coming home wearing bloody clothes on the night of the killing, and calling Ms. Wells at work after she left the Defendant and returned to Alabama. The record reflects that Ms. Wells did not violate the trial court's order limiting her testimony.

The only portion of her testimony that related to a violent incident was the occasion in which she said the Defendant placed a knife at her throat and made incriminating statements about his mother's killing. Ms. Wells testified at the trial pursuant to the trial court's order that sometime after the victim's death, the Defendant grabbed her hair, put a knife to her throat, and said, "[Y]ou know what happened to my mother, you don't think I'll hesitate for a second with a w---- like you." To the extent that the Defendant argues the trial court erred by allowing Ms. Wells to testify about this incident, we conclude that the trial court did not abuse its discretion.

The evidence was not presented to establish that the Defendant acted in conformity with any violent tendency in killing his mother. To the contrary, Ms. Wells's testimony was material to establishing and circumstantial evidence of the identity of the victim's killer. The trial court credited Ms. Wells's testimony and found it clear and convincing. The court found that the materiality of the testimony in identifying the perpetrator substantially outweighed the danger of unfair prejudice to the Defendant. We note that on appeal, the Defendant's brief focuses on Ms. Wells's credibility, and the record reflects that defense counsel engaged in an extensive cross-examination challenging her credibility and motives for coming forward years after the killing and after she left the Defendant and Tennessee.

To the extent that the Defendant argues the trial court erred by allowing Ms. Wells to testify about the Defendant's calling her at work after she returned to Alabama and asking her, "Do you think I wouldn't be able to find you." The record reflects that the testimony was presented to explain the material issue of why Ms. Wells remained silent for more than twenty-five years before telling law enforcement about what she observed on the night of the killing and about the Defendant's incriminating statement. The testimony was also material to whether the Defendant would have wanted her to remain silent after he came home wearing bloody clothes and later incriminated himself in his mother's killing. Any prejudice was slight and was not substantially outweighed by the probative value. We conclude that the trial court did not abuse its discretion by allowing her to testify regarding the telephone call. The court again found that the probative value of the telephone call Ms. Wells received from the Defendant while working was not substantially outweighed by any danger of unfair prejudice. The Defendant is not entitled to relief on this basis.

### B.      Ms. Holsinger

The Defendant's argument in his brief regarding Ms. Holsinger consists, in its entirety, of the following:

> Says nothing till 2011. In the meantime, her child was taken from her and AWARDED to Hill. She NEVER said, PLEASE don't give my child to my mother-murdering ex! Her version of the confession matched the scene in no way. She claimed he told her step-by-step how he killed his mother. That he made it look like a robbery or burglary, climb through a laundry room window and entered the house, rummaged through the house to make it look like someone broke in, looked for some bond things from his dad or something. Then he hid in his mother's closet, waited for her to come in, watched her change into her nightgown, she started towards the bed, and that's when he jumped out of the closet. He claimed he stabbed her. She said she hadn't said anything since 1991 because he threatened to kill her. This testimony is not clear and convincing. Nor is there a chance that its more probative then prejudicial.

Again, the Defendant fails to cite to the record. *See* T.R.A.P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). We caution counsel again that appellate review is frustrated by the failure to identify the basis in the record for the argument presented and that compliance with the Rules of Appellate Procedure is expected. We interpret from the Defendant's brief that he does not allege Ms. Holsinger's testimony regarding the single violent incident during which the Defendant confessed to the killing violated Rule 404(b). Rather, his brief reflects that he alleges Ms. Holsinger's testimony regarding the contents of the confession itself was inadmissible pursuant to Rule 404(b). To the extent that he argues Ms. Holsinger's testimony regarding the Defendant's confession violated

-32-

Rule 404(b), the Defendant's reliance on this rule is misplaced. Rule 404(b) was not applicable to this testimony because its purpose is to exclude evidence of prior bad conduct offered to show the Defendant acted in conformity with a particular character trait, such as that the Defendant was violent and therefore killed the victim. Ms. Holsinger's testimony reflects that the Defendant confessed to killing his mother and that he explained the steps he took to accomplish the task. As a result, Rule 404(b) could not have been a basis for excluding Ms. Holsinger's testimony that the Defendant confessed to killing the victim. The jury determined her credibility and assigned whatever weight it thought proper to her testimony, and we note the Defendant's extensive cross-examination challenging Ms. Holsinger's credibility. The Defendant is not entitled to relief on this basis.

### C.    Julio Allen

The Defendant contends that the trial court erred by allowing Mr. Allen to testify when his jaw was wired closed because it permitted the jury to assume the injury was inflicted by the Defendant. He also states in his brief, "This issue would be argued . . . also under the Rule 404(b) argument." The State responds that the trial court properly allowed Mr. Allen to testify.

The record reflects that at the time of the trial, Julio Allen's jaw had been broken recently and that his mouth was wired closed. At the jury-out hearing, Mr. Allen testified that he believed the Defendant was partially responsible for the injury because the Defendant had shown several inmates a photograph of Mr. Allen and had told inmates Mr. Allen was a "snitch." Mr. Allen said he was attacked by Crip gang members, although the Defendant was not a gang member. Mr. Allen said he had offered information in two additional state cases and one federal case.

Defense counsel believed that the jury would infer that the Defendant was involved in the incident resulting in Mr. Allen's broken jaw because Mr. Allen was going to "snitch" on the Defendant. The trial court disagreed and found that the inference was "a big stretch." The court determined that the best course of action was not to mention it. The court permitted the State to ask Mr. Allen if he had sustained an injury to his jaw that affected the clarity of his speech but prohibited Mr. Allen from discussing how he sustained the injury or who might have caused it. When the trial resumed, the following exchange occurred:

Q:    And as a preliminary matter, you're able – you may need to move closer to the mic, but your speech is limited a little bit; is that correct?

A:    Yes.

Q:     And is that because of an injury that has caused your jaw to be wired?

A:     Yes, it is.

Q:     And try to speak – I'm sure you'll try to speak as clearly as you can.

A:     Yes.

No additional comments were made regarding Mr. Allen's injury.

We conclude that the trial court did not abuse its discretion by allowing Mr. Allen to testify. No evidence presented to the jury suggested Mr. Allen's injury was attributable to the Defendant. Although Mr. Allen's mouth was wired closed, no evidence suggested the jury had difficulty understanding his testimony. The Defendant is not entitled to relief on this basis.

To the extent that the Defendant argues Mr. Allen's testimony should have been excluded pursuant to Rule 404(b), the Defendant's reliance on this rule is misplaced. Mr. Allen's testimony related to his befriending the Defendant, their discussions about their respective criminal matters, and the Defendant's statements to Mr. Allen regarding the Defendant's involvement in the victim's killing. Mr. Allen did not testify regarding any other crimes, wrongs, or acts perpetrated by the Defendant. Therefore, Rule 404(b) was inapplicable to Mr. Allen's testimony. The Defendant is not entitled to relief on this basis.

### III.     Motion for a Mistrial

The Defendant contends that the trial court erred by denying his motion for a mistrial after Ms. Holsinger violated the court's order by testifying about the Defendant's alleged previous violent conduct toward her. The State responds that the court properly denied the request for a mistrial. We agree with the State.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

During the pretrial hearing, the trial court limited Ms. Holsinger's testimony regarding the Defendant's violent acts to the single incident during which the Defendant implicated himself in the victim's killing. The court prohibited Ms. Holsinger from testifying about any other violent incidents, the Defendant's drug use, and the Defendant's alcohol intoxication because the court determined it was irrelevant and immaterial.

The record reflects the following exchange during Ms. Holsinger's direct examination at the trial:

Q:    And I'd like to direct your attention back to some time – it would have been around – I don't recall if it had been into August or September of 1991. Was there an act of violence perpetrated on you by Mr. Hill?

A:    Yes, sir.

Q:    And during this act of violence, did you suffer any injuries?

A:    Yes, I suffered injuries every time of it.

Q:    I'm just talking about this time.

A:    Yes, sir.

Defense counsel objected, and an immediate jury-out hearing was held, during which counsel requested a mistrial. Counsel argued that Ms. Holsinger violated the trial court's order prohibiting her from discussing incidents of violence other than the incident in which she alleged the Defendant made statements regarding the victim's death. Counsel noted the extensive pretrial hearing held regarding this subject matter and argued Ms. Holsinger violated the court's order almost immediately during her testimony. The prosecutor informed the court that before entering the courtroom, he and Ms. Holsinger discussed that her testimony would be limited to the single incident and that the prosecutor had no idea Ms. Holsinger would reference other incidents of violence. The prosecutor said the statement was not sufficient to affect the jury's verdict and asked for a curative instruction. Defense counsel objected to an instruction because it would have further highlighted incidents of alleged abuse.

The trial court determined that Ms. Holsinger "clearly" violated the court's previous ruling prohibiting her from testifying about incidents of violence other than the incident in which the Defendant made statements about the victim's death. The court noted the leading nature of the prosecutor's questions in an effort to avoid Ms. Holsinger's referencing additional incidents of violence and determined that the prosecutor was not attempting to elicit prohibited testimony. The court found that Ms.

Holsinger violated the court order "on her own." The court found, though, in light of the court's ruling that she was permitted to discuss the single act of violence in which the Defendant allegedly admitted killing the victim, Ms. Holsinger's statement had minimal impact. The court found that although the prosecutor attempted to "focus" Ms. Holsinger, the prosecutor's efforts "sort of compounded" the problem. The court found that the implication of Ms. Holsinger's testimony was that other episodes occurred, but it concluded that the Defendant had not been deprived of his right to a fair trial. The court denied the motion for a mistrial and offered to provide the jury with a curative instruction. Defense counsel declined the instruction because he did not want the court to draw attention to the improper testimony. The court found that not providing an instruction "create[d] less damage in this case" and that providing an instruction would have brought more attention to the testimony and "damage" the Defendant.

Ms. Holsinger violated the trial court's order by inferring that the Defendant was violent toward her more than once and that she suffered injuries every time the Defendant was violent. The record supports the trial court's finding, though, that the State did not intend to elicit the improper testimony and carefully attempted to limit Ms. Holsinger's testimony to the single permitted incident. Ms. Holsinger's comment was general and provided no detail about acts of violence in which the Defendant may have engaged against her. When questioning resumed, Ms. Holsinger did not further violate the court order, limiting her testimony to the single permissible incident. The comment had minimal impact, and therefore, the Defendant failed to establish a manifest necessity. We conclude that the trial court did not abuse its discretion by denying the Defendant's request for a mistrial.

## IV.    Corroboration Jury Instruction

The Defendant contends that the trial court erred by refusing to provide a jury instruction regarding corroboration. He argues that the jury should have been instructed that the State was required to corroborate any statement the Defendant made to Ms. Wells, Ms. Holsinger, and Mr. Allen. The State responds that the sufficient evidence corroborated the Defendant's statements.

As a preliminary matter, although the Defendant's stated issue is whether the trial court erred by refusing to provide a jury instruction regarding corroboration of the Defendant's statements to his former wives and to Julio Allen, he neither cites to the record in which the final jury instructions were discussed at the trial nor to any legal authority relevant to jury instructions. *See* T.R.A.P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). Appellate review is again frustrated by counsel's failure to comply with the Rules of Appellate Procedure, and we caution counsel that repeated instances of noncompliance will result in waiver. In his brief, the Defendant's argument focuses on whether sufficient evidence corroborated the Defendant's extrajudicial statements. We interpret

the Defendant's issue as relating to the trial court's refusal to instruct the jury on corroboration.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34. "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); *see State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

The record reflects that defense counsel requested a jury instruction relative to corroborating the Defendant's statements to Ms. Wells, Ms. Holsinger, and Mr. Allen. Counsel told the trial court that a pattern instruction did not exist but suggested an instruction that "a confession by the defendant standing alone is not enough for a guilty verdict. The confession may be taken in connection with other evidence, direct or circumstantial, corroborating them and if, from all the evidence so considered together, the crime and the guilt of the person . . . is established beyond a reasonable doubt." The prosecutor stated that defense counsel was discussing corpus delicti, which was a matter for the court to determine. The prosecutor stated that the trial court, not the jury, should determine whether sufficient evidence corroborating the Defendant's statement existed to establish the corpus delicti because it was an aspect of whether sufficient evidence existed to support a conviction. The prosecutor stated that once a trial court determined that the State presented sufficient evidence corroborating a defendant's statement, the general pattern jury instruction regarding confessions and statements against interests was warranted.

After review of relevant legal authority, the trial court relied, in large part, upon *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014), in denying the Defendant's request for the jury instruction. The court noted that the recent legal authority reflected that the proper procedure was for the trial court to make a determination regarding corroboration of the Defendant's extrajudicial statements and that if sufficient corroboration existed to establish trustworthiness pursuant to the modified trustworthiness standard, any contradictory evidence became a credibility determination for the jury. The court denied the request and stated that at the end of the proof, it would determine whether sufficient corroboration existed to allow the jury to deliberate.

At the close of the proof, the Defendant made a motion for a judgment of acquittal on the basis that the statements the Defendant allegedly made to Ms. Wells, Ms.

-37-

Holsinger, and Mr. Allen were not corroborated and that the testimony of the witnesses was not credible. The trial court determined that the critical issue was the identity of the perpetrator and that three witnesses testified regarding the Defendant's incriminating statements.

Relative to Ms. Holsinger, the trial court noted that she testified that the Defendant, while in a "violent fit," stated that he killed the victim and that he would kill Ms. Holsinger. The court noted that after the violent incident, Ms. Holsinger said the Defendant admitted stabbing the victim because of money, taking bonds from a lockbox, and opening a window and ransacking the house to make it look as though a burglary occurred. The court acknowledged the defense had presented evidence challenging Ms. Holsinger's credibility but found that a reasonable juror could find Ms. Holsinger's testimony regarding the Defendant's statement true. The court found that the details contained in the Defendant's statement were corroborated by other trial evidence. The court found that the crime scene photographs and the autopsy results reflected the victim was stabbed to death and that someone had tampered with the lockbox. The court found that the evidence of the victim's life insurance policy, regardless of the Defendant's trust fund, supported the financial motive expressed in the Defendant's statement. The court determined that pursuant to the modified trustworthiness standard, sufficient evidence corroborated Ms. Holsinger's testimony. The court noted that the jury was free to credit or discredit the testimony but that contradictory evidence did not render the Defendant's statement to Ms. Holsinger untrustworthy.

Relative to Ms. Wells, the trial court recounted her testimony regarding the Defendant's relationship with the victim and regarding the weekend of the killing. The court found that Ms. Wells stated that the Defendant was not home, that he returned late with his friend Mr. Haskins, that the men were upset, that the Defendant had blood on his clothes, and that the Defendant said, "The b---- made me do it." The court found that Ms. Wells's testimony provided circumstantial evidence that the Defendant was "involved in some act that resulted in blood that night." The court found that this evidence, along with her testimony that the Defendant told her to tell the police they had gone fishing that evening, provided sufficient evidence, if found credible, for a reasonable juror to determine that the Defendant had a guilty conscience because he was attempting to create an alibi. The court found circumstantial evidence to connect the Defendant to the victim's killing.

Relative to Mr. Wilson, the trial court found that although the defense challenged Mr. Wilson's credibility, Mr. Wilson was adamant he saw the Defendant's car in the victim's driveway. The court found that if believed, the testimony placed the Defendant at the victim's house around the time of the killing. The trial court did not address Mr. Allen's testimony.

The trial court found based upon the testimony of Ms. Holsinger, Ms. Wells, and Mr. Wilson that a reasonable juror could find that the Defendant was the person who committed first degree murder. The court noted that the jury might discredit a portion or all of the testimony but that enough evidence had been presented to allow the jury to deliberate.

The record reflects that the parties did not address the requested instruction again but that the trial court provided an instruction relative to admissions against interest. The instruction read as follows:

> Evidence has been introduced in this trial of a statement or statements by the defendant made outside the trial, to show an admission against interests. An admission against interest is a statement by the defendant which acknowledges the existence or truth of some fact necessary to be proven to establish the guilt of the defendant or which tends to show guilt of the defendant or is evidence of some material fact, but not amounting to a confession.

> While this evidence has been received it remains your duty to decide if in fact such statement was ever made. If you believe a statement was not made by the defendant you should not consider it. If you decide the statement was made by the defendant, you must judge the truth of the facts stated. In so determining, consider the circumstances under which the statement was made. Also consider whether any of the other evidence before you tends to contradict the statement in whole or in part. You must not, however, arbitrarily disregard any part of any statement, but rather should consider all of any statement you believe was made and is true. You are the sole judges of what weight should be given such statement. If you decide a statement was made, you should consider it with all other evidence in the case in determining the defendant's guilt or innocence.

*See* T.P.I.—Crim. 42.11 Admission Against Interest (19th ed. 2015).

Recently in *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014), our supreme court adopted the modified trustworthiness standard when establishing corroboration of a defendant's extrajudicial statements. In *Bishop*, the court stated that "a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces 'independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury.'" *Id*. at 58 (quoting *State v. Lucas*, 152 A.2d 50, 60 (N.J.1959)). The court stated that when a crime does not result in tangible injury, the corroboration "must implicate the accused in order to show that a crime has been committed." *Id*.; *see Smith v. United States*, 348 U.S. 147, 154 (1954).

The modified trustworthiness rule "requires 'substantial' independent evidence to bolster a defendant's extrajudicial confession or admission." *Id*. (citing *Opper v. United States*, 348 U.S. 84, 93 (1954)). The court explained the analysis courts should apply when a defendant challenges the admission of his extrajudicial statements on the basis of lack of corroboration. If the charged offense involves a tangible injury, the State is required to provide "substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred." *Id*. at 59. The State is neither required to demonstrate that the "injury resulted from someone's criminal act" nor "link the defendant to the injury." *Id*. (citing *Lucas*, 152 A.2d at 60). The State must "introduce substantial independent evidence that the defendant's confession is trustworthy," which is accomplished by presenting independent evidence corroborating the "essential facts contained in the defendant's statement." *Id*. The court noted that independent corroboration of one key portion of a defendant's statement might corroborate the whole statement. *Id*. The court determined that another method of bolstering a defendant's admission "is to present independent evidence that 'parallel[s] the defendant's confession' or corroborates the defendant's account of what happened immediately before or after the crime." *Id*. at 60 (quoting *State v. Weisser*, 150 P.3d 1043, 1051-52 (N.M. 1985)). After the State presents independent evidence establishing the prima facie trustworthiness of an admission or confession, "the existence of contradictory evidence does not necessarily render the confession untrustworthy." *Id*. at 61. Rather, contradictory or conflicting evidence simply raises a credibility issue to be resolved by the finder of fact. *Id*.

A trial court's determination of whether a defendant's extrajudicial admission or confession is sufficiently corroborated is a mixed question of law and fact, and the standard of review on appeal is de novo. *Id*. A trial court's factual determinations are presumed correct unless the record preponderates against them. *Id*. 61-62 (citing *Weisser*, 150 P.2d at 1045).

The record reflects that the medical examiner concluded the victim's cause of death was multiple stab wounds and that the manner of death was homicide. The offense involved a tangible injury, i.e. the death of the victim, which was corroborated by the medical examiner's testimony. We note that the victim's death was not disputed at the trial and that the only disputed fact was the identity of the perpetrator. The State was also required to establish the trustworthiness of the Defendant's extrajudicial statements to Ms. Wells, Ms. Holsinger, and Mr. Allen by providing substantial independent evidence corroborating the facts in the statements.

Ms. Holsinger testified that during a 1991 physical altercation, the Defendant stated that he had stabbed the victim to death and that he would get away with killing Ms. Holsinger. She said the Defendant stated that he made the victim's killing look like a burglary by making it appear as though someone had entered the victim's home through the laundry room window and had "rummaged through" the home. She said the

-40-

Defendant told her that he left a lockbox outside the home also in an effort to make the killing look like a burglary. Ms. Holsinger testified that the Defendant told her that he waited in the bedroom closet for the victim to arrive, waited for the victim to change her clothes, jumped out of the closet, and began stabbing the victim.

Mr. Allen testified that he and the Defendant discussed the Defendant's pending criminal charges when confined at the jail. Mr. Allen said that the Defendant admitted killing his mother for insurance money, that the Defendant and the victim had a "falling out," that he had no money, that he "lost it," and that he stabbed the victim five or six times. Mr. Allen testified that the Defendant stated he made the scene look as though a robbery occurred, broke into the victim's lockbox and took about $4,000 of the victim's property, and went home wearing bloody clothes. Mr. Allen said the Defendant told his then-wife what occurred and that the wife never reported the Defendant to the police. Mr. Allen stated that the Defendant reported inheriting approximately $60,000.

The record reflects that the Defendant reported discovering the victim's body and that he told the responding officer he believed a burglary had occurred and requested the officer inspect an open window that was usually closed and secured. The officer concluded it was impossible someone had entered the home through the window because it was too small and the cobwebs and dust around the window were undisturbed. Photographs of the crime scene showed the victim dressed in a nightgown, blood on her chest and nightgown, and stab wounds to her chest. The photographs and witness testimony established that the victim was found on her bedroom floor and that a pried-open lockbox was found in the same bedroom. Ernest Wilson was adamant that he saw the Defendant's car parked in the victim's driveway around the time of the murder. The medical examiner testified that the victim suffered six stab wounds, that the stabbing occurred when the victim was on or around the bed, that the victim could have been upright when the incident began, and that most of the stab wounds were inflicted when the victim was lying down. Ms. Wells testified that the Defendant retuned home late on the night of the killing, that his clothes were bloody, and that he was agitated and frantic. Furthermore, the Defendant submitted claims for the victim's unpaid compensation and life insurance benefits from her employer, which totaled approximately $70,000. Likewise, the Defendant's trust fund was overseen by the victim, and the victim's approval was required for large disbursements from the account beyond the Defendant's monthly distribution, which was a source of contention and led to arguments between the victim and the Defendant.

We conclude that the State established the trustworthiness of the Defendant's statements to Ms. Holsinger and Mr. Allen by providing substantial independent evidence corroborating the facts contained in the Defendant's statements. Although the defense challenged the credibility of the witnesses, credibility was a determination for the jury and did not impact the trustworthiness of the statements because the assertions contained in the statements were corroborated by substantial independent evidence. We conclude

that the Defendant's statements to Ms. Holsinger and Mr. Allen were adequately corroborated.

Ms. Wells, however, did not testify that the Defendant admitted killing the victim. She testified regarding her observations of the Defendant when he returned home late with Mr. Haskins on the night of the killing. She stated that the Defendant was agitated and frantic, that the Defendant's clothes were bloody, and that the Defendant told Mr. Haskins and Ms. Wells to "shut up" because the Defendant needed to think. She heard the Defendant say, "The b---- made me do it," and saw the Defendant grab clothes, garbage bags, and cleaning items and leave with Mr. Haskins. Ms. Wells testified that the Defendant instructed her to tell the police that they were fishing that night and told her she would be sorry if she told the police anything else. None of this evidence amounts to a confession of guilt in the victim's killing, and therefore, the evidence required no corroboration. Furthermore, Ms. Wells's testimony that sometime after the victim's death, the Defendant grabbed her hair, put a knife to her throat, and said, "[Y]ou know what happened to my mother, you don't think I'll hesitate for a second with a w---- like you" is not a confession of guilt requiring independent corroboration. The statement is circumstantial evidence that the Defendant was involved in the victim's killing.

We conclude that the Defendant's statements to Ms. Holsinger and Mr. Allen were adequately corroborated pursuant to the modified trustworthiness standard. We likewise conclude that no jury instruction was required because whether the statements were adequately corroborated is a question of law for the trial court, not the jury, to determine. Likewise, the admissions against interest pattern jury instruction provided by the trial court addressed the juror's duty to determine whether the Defendant made the statements, and if so, to determine the truth of the facts. The Defendant is not entitled to relief on this basis.

## V.    Prosecutorial Misconduct

The Defendant contends that the prosecutor committed multiple instances of misconduct during closing argument. The State responds that the Defendant failed to establish the prosecutor engaged in misconduct.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of

discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).
5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether

the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

## A.    Julio Allen

The Defendant asserts that the prosecutor improperly argued that Mr. Allen knew about the life insurance policy only because the Defendant "confessed it" to Mr. Allen. The Defendant argues that Mr. Allen had access to the discovery materials, which contained information about the policy. The Defendant notes that Mr. Allen admitted telling the Defendant that he could assist in the defense only if the Defendant told him all the facts of the case and that the Defendant could have told Mr. Allen the police believed the Defendant killed the victim for the life insurance proceeds. The Defendant, likewise, notes that Mr. Allen was not credible and could have told the police the Defendant killed the victim based on the Defendant's stating the police believed the Defendant killed the victim for money.

The record reflects the following during the prosecutor's closing argument:

. . . And we know [the Defendant] was the beneficiary of this life insurance policy. And that becomes important when we look at . . . the motive, . . . what evidence do we have that he's the one that killed his mother.

Well, let's talk about what Juilo Allen says. Now, [defense counsel] is gonna say, well, [Mr. Allen] could have got somebody to Google it, or he could have got somebody to do this, or he could have snuck in his cell and read through [the Defendant's] file, but let's say he found a[n] article about the murder. He might have found out she was stabbed. We know he knows she was stabbed. He might have found out about the lockbox and . . . somehow – through some manner like that if he was able to find somebody to Google it or whatever. But, you know, if he was gonna tell everything that would be . . . a fact – one thing he would not have known is about the life insurance policy because that was not mentioned in the press or anything. That issue . . . the life insurance proceeds were paid into Chancery Court, and there was a lawsuit over . . . dividing that up sometime much later than the murder. It had nothing to do with the murder at that time until we started looking into this for the motive as to why he would have killed his mother. So I submit to you that Mr. Allen's testimony is very credible when you look at the way that he would have got that information, is as he told you, in the conversations during their breaks sitting out there around the prison talking about [the Defendant's] case.

The record reflects that the Defendant did not object during closing argument. *See* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a

party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").  The State contends the Defendant has waived consideration of this issue because he failed to object contemporaneously, and the Defendant has not addressed the State's argument.  We conclude that the issue is waived for failure to object contemporaneously, and we decline to review the issue for plain error.  The Defendant is not entitled to relief on this basis.

## B.      Burglary and the Lockbox

The Defendant asserts that that the prosecutor misled the jury when he argued the Defendant attempted to convince the responding police officers that the victim had been killed during a robbery "when the only thing taken was the lockbox."  He argues the prosecutor's stating that the lockbox contained bonds and that evidence showed the Defendant wanted the lockbox was improper.  The State responds that although the trial court did not sustain defense counsel's objection, the court provided a curative instruction and that no error occurred.

We note that the Defendant neither cites to the relevant portion of the prosecutor's argument nor to legal authority supporting his argument.  *See* T.R.A.P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).  In any event, the record reflects the prosecutor stated the following:

> . . . let's look what happens when the police get to the scene, you know, what Larry Gilland says he finds.  Well, he says it's kind of odd, you know, [the Defendant], you saw the pictures of [the victim] laying in the floor with the holes in her chest.  He's just found his mother like that, and he's calm about it.  And what he immediately starts trying to do is say, okay, this had to be a burglary.  Somebody came in here, and they must have come in through this window because I used my key to get in the door and so, this has to be how it happened.  I mean, repeatedly takes him to the window trying to get . . . Gilland, to believe that somebody had broken into the house in order to do a robbery and killed his mother in the meantime.
>
> But the house is not ransacked.  I mean, the only thing that anybody has gotten into in the house, it appears, is this lockbox that had the bonds in it that we know that [the Defendant] wanted the box.

Defense counsel objected on the basis that no evidence showed bonds were in the lockbox.  The trial court instructed the jury that counsel's arguments were not evidence, that the jurors were to weigh the evidence heard during the trial, and that the jurors should disregard counsel's arguments if they conflicted with the evidence.

The trial evidence reflects that the lockbox was found pried open and inside the victim's bedroom at the time the victim was discovered and that the lock to the box was found outside the home two months later when the police returned to the scene. Ms. Wells testified extensively about the Defendant's and the victim's arguments regarding money. Ms. Wells also testified that the Defendant told her that the victim kept the bonds in a lockbox inside the victim's home. We conclude that although evidence showed the Defendant believed the lockbox contained the bonds, no evidence showed that the bonds were taken from the lockbox at the time of the killing. To the contrary, the record reflects that the bonds were found inside the victim's car. Although not presented at the trial, the supplemental police report completed by Detective Stiles reflects that three days after the victim's body was discovered, Detective Stiles returned to the crime scene after receiving information that the victim had hidden the bonds in the victim's car upon learning the Defendant had stolen some of the bonds, that Detective Stiles searched the glove box of the victim's car, and that he found bonds valuing $4400 in the glove box. As a result, the prosecutor's stating that the lockbox contained the bonds at the time of the killing was a misstatement of the evidence. However, we conclude that the statement did not affect the jury's verdict to the prejudice of the Defendant.

The evidence shows that at the time of the killing, Ernest Wilson saw the Defendant's black car parked at the victim's house, although Mr. Wilson was unclear about the make and model of the black car. After discovering the victim, the Defendant's demeanor was calm and emotionless, and he was seen grinning as the victim's body was removed from the home. Upon the victim's death, the Defendant submitted claims for the victim's unpaid compensation and an application to receive life insurance benefits, all of which totaled $70,000. The initial investigation led the police to believe the Defendant killed the victim for financial gain, and witness testimony reflected that the Defendant and the victim argued frequently about the money contained in the Defendant's trust fund. Although the Defendant received a monthly distribution from the fund and could have obtained additional nominal amounts from the fund's administrator, the victim had to approve large disbursements. While in jail, the Defendant told Julio Allen that he had killed his mother for insurance money after a falling out with the victim, that the Defendant needed money, that he "lost it" and stabbed the victim five or six times, that he went home wearing bloody clothes, and that he told his then-wife what had occurred. Ample evidence was presented that the victim was killed for financial gain, regardless of whether bonds were taken from the lockbox. Furthermore, Ms. Wells's testimony regarding the night of the killing corroborates Mr. Allen's testimony that the Defendant arrived home late with Mr. Haskins, that the men were frantic, and that the Defendant's clothes were bloody. Ms. Wells testified that the Defendant stated, "[T]he b---- made me do it." Ms. Wells saw the Defendant grab trash bags, clothes, and cleaning items, leave the home, and return hours later wearing different clothes. The Defendant is not entitled to relief on this basis.

## C. Improper Vouching

The Defendant asserts that the prosecutor improperly vouched for Ms. Wells and Ms. Holsinger by stating the women had no reason to lie. The State responds that witness credibility was critical to this case and that the prosecutor's statements were nothing more than "an invitation to the jury to carefully consider" the testimony and to determine the witnesses' credibility.

We note, yet again, that the Defendant failed to cite to the relevant portion of the prosecutor's argument and to legal authority supporting his argument. *See* T.R.A.P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). We are dismayed by counsel's repeated disregard for the Rules of Appellate Procedure and the rules of this court and note counsel is a veteran criminal defense attorney. The record reflects, in relevant part, that the prosecutor told the jurors they could determine Ms. Holsinger did not want to testify at the trial because she was scared, that Investigator Day admitted it was difficult for him to locate Ms. Holsinger during his investigation, and that "[t]here's no reason that she would have to come in here, sit – have – from 1991 to today to tell you some kind of lie about [the Defendant]." The prosecutor also discussed Ms. Wells's fear of the Defendant and her being seventeen years old at the time of the victim's death and thinking the Defendant killed his mother. The prosecutor told the jurors, "And again, there's no reason for her to come here and tell you these lies 27 years afterwards, I mean, to come all the way up here from [Alabama] on two different occasions just to be here at this trial and tell you that [the Defendant] killed his mother other than that she wants justice for [the victim]."

We note that during defense counsel's closing argument, he rightfully focused on witness credibility. In fact, counsel's first statement to the jurors was "[r]evenge is a dish best served in Court." Counsel focused his argument relative to Ms. Holsinger's credibility by distinguishing the details Ms. Holsinger provided with the evidence obtained from the crime scene, including the number of stab wounds the victim suffered, the location of the lockbox, and whether the house was ransacked. Counsel focused his argument relative to Ms. Wells's credibility on the portions of her testimony that conflicted with portions of the trial evidence, including her statement that the Defendant's clothes were bloody, despite the medical examiner's testimony that most of the blood from the victim's injuries would have been internal bleeding and despite the lack of blood inside the Defendant's car. Counsel stated that he could not explain why Ms. Wells was "telling an untruth," that he could not "prove why she would lie," and that he could only tell the jurors she lied.

In rebuttal, the prosecutor told the jurors that the "legal issue for your consideration is the credibility of . . . these witnesses, whether or not you believe these witnesses that testified[.]" The prosecutor then focused on the factors generally used in the jury instruction to guide a juror's credibility determination of the witnesses, including

whether Ms. Wells could hear and see clearly when she saw the Defendant return home around the time of the killing and whether Ms. Wells and Ms. Holsinger had clear memories. The prosecutor stated relative to Ms. Wells that "if [she's] making all this stuff up that [defense counsel] wants you to believe, that's academy award material right there." The prosecutor told the jury to remember the women's demeanors during their testimony and to determine whether the women answered questions directly or evaded answering them and whether the women provided detailed testimony.

The prosecutor also stated in his rebuttal argument that defense counsel had suggested that Ms. Holsinger and Ms. Wells had "some sort of revenge motive." The prosecutor stated, "If that were the case, they would have been up here long ago, not 26 years, 27 years later." The prosecutor noted that the witnesses did not want to testify and stated that the witnesses did not come forward because they were scared of the Defendant.

Although the Defendant did not contemporaneously object to the prosecutor's statements that Ms. Holsinger and Ms. Wells had no reason to lie, he requested a mistrial after the jury began deliberations. Counsel argued that the prosecutor's statements were impermissible bolstering. The trial court disagreed. Relative to Ms. Holsinger, the court found that although some of Ms. Holsinger's testimony did not "match" the crime scene, portions of her testimony matched the scene and that the State was permitted to argue that her testimony supported the evidence. Relative to Ms. Wells, the court found that it was permissible for the jury to evaluate her demeanor during her testimony in determining whether she was being truthful. The court determined that the State did not impermissibly bolster the testimony of Ms. Wells and Ms. Holsinger.

Vouching occurs when a prosecutor expresses personal opinion that a witness is telling the truth. *See, e.g.*, *State v. Sexton*, 368 S.W.3d 371, 419-20 (Tenn. 2012); *Goltz*, 111 S.W.3d at 6-7. Our supreme court has repeatedly condemned a prosecutor's expression of personal belief in the truth or falsity of evidence. *See, e.g.*, *Sexton*, 368 S.W.3d at 420. The term "bolstering" generally refers to the admission of a witness's prior consistent statement. *See State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); *State v. Robert D. Walsh*, No. W1999-01473-CCA-R3-CD, 2001 WL 91949, at *8 (Tenn. Crim. App. Jan. 30, 2001) ("'[B]olstering' generally refers to the situation in which the state offers a prior consistent statement of the victim to enhance the credibility of her testimony at trial."), *perm. app. denied* (Tenn. June 4, 2001).

We conclude that despite the theme that Ms. Holsinger and Ms. Wells were believable witnesses, the prosecutor's argument was limited to explaining why the jury should accredit the testimony of Ms. Holsinger and Ms. Wells. The prosecutor did not make inappropriate statements about his personal belief in the witness testimony. To the contrary, the prosecutor's statements were focused on explaining why Ms. Wells and Ms. Holsinger testified truthfully. Defense counsel challenged the credibility of Ms. Wells

-48-

and Ms. Holsinger because it was critical to the outcome of the trial, and counsel's opening remarks during his closing argument were about the witnesses' motive to obtain revenge against the Defendant. The prosecutor did not engage in impermissible vouching or bolstering, and the Defendant is not entitled to relief on this basis.

## D. The Victim's Enemies

The Defendant asserts that the prosecutor misled the jury by arguing that no testimony showed the victim had any enemies other than the Defendant. He stated that the defense "clearly elicited testimony" from Wanda Brown that David Nave "was a jealous boyfriend and that [the victim] intended to break off the relationship," that the neighborhood had been targeted by burglaries around the time of the killing, and that Investigator Day knew "there had been other suspects" in the killing.

We note, yet again, that defense counsel had not cited to the relevant portion of the prosecutor's argument, to the witness testimony, and to legal authority supporting his argument. *See* T.R.A.P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). In any event, the record reflects that the prosecutor stated the following during the rebuttal argument:

> There has not been one word of testimony from this witness stand or one document that's been introduced as an exhibit in this case to even suggest that anybody other than [the Defendant] killed [the victim], not one.
>
> . . . Wanda Brown, her best friend that she went to the fair with that night. Nobody has testified to anything negative about [the victim] that would suggest she had any enemies in this world other than [the Defendant]. And how do we know that – we use the word enemy – how do we know that that was not a good relationship? From what the witnesses told you . . . .

Defense counsel objected on the ground that the prosecutor misconstrued the evidence because Ms. Brown ultimately admitted during cross-examination that Mr. Nave was a jealous boyfriend. The trial court overruled the objection and stated the jury would determine whether the evidence supported the prosecutor's argument.

The record reflects that the prosecutor did not question Ms. Brown about Mr. Nave during direct examination. During defense counsel's cross-examination, Ms. Brown initially testified that she did not know who the victim was dating at the time of the victim's death. Ms. Brown said that she did not know the victim was dating Mr. Nave and that the victim never mentioned him. After refreshing her recollection with her 1986 statement to the police, she agreed she knew the victim was dating someone but that the victim never identified the man's name. Ms. Brown recalled the victim said that the man had bought concert tickets but that the victim was thinking about ending the

relationship. The record does not reflect that Ms. Brown, or any witness, testified that Mr. Nave was a jealous boyfriend. The Defendant is not entitled to relief on this basis.

### E.    Julio Allen's Plea Agreement

The Defendant argues that the prosecutor's statements regarding whether a plea agreement existed between the State and Mr. Allen in exchange for his testimony improperly shifted the burden to the defense. The State responds that the prosecutor's statements were proper.

The record reflects that during the prosecutor's rebuttal argument, he stated that defense counsel wanted the jury to believe that Mr. Allen was

> made all kind[s] of promises to get him to come in here and bolster up this case against Mr. Hill. He told you there was not, and there's been . . . no proof to the contrary. There's been names thrown about, Attorney General Nassios, Attorney General Fitzgerald and so forth that just live – the officer is just right over there. Bring them in here if there's a deal that he wants you to believe has been made. He can go over and get them and bring them in here, let them tell you there was or was not a deal. He knows there was no deal, otherwise, he would have brought them in here.

Defense Counsel did not contemporaneously object but requested a mistrial after the jury began its deliberations. Counsel argued that the State knew that

> the only reason Julio testified is because once this is all over, he's going to get a break in his sentence. And it's not just here. They did the same thing in Federal Court. You get to plead, but you don't get sentenced until after the trial so everybody can say there is no deal. That is the most dishonest situation to put this snitch up here and let him say there is no deal, when he said, I'm here testifying in the fervent hopes – actually he said yes when I asked that – in fervent hopes of getting a deal. It's dishonest and it misleads the jury.

The trial court found that the State argued that no plea agreement existed with Mr. Allen and that Mr. Allen was "pretty straightforward" that he hoped to receive a plea offer by testifying against the Defendant. The court determined that the State did not misstate the evidence or mislead the jury by stating Mr. Allen did not have a plea agreement "at this point."

We conclude that the issue is waived for counsel's failure to object contemporaneously, and we decline to review it for plain error. The Defendant is not entitled to relief on this basis.

-50-

## F. Controlled Jail Environment

The Defendant argues that the prosecutor misstated Lieutenant Patrick's testimony regarding the controlled environment at the jail where the Defendant and Mr. Allen were confined. The State responds that the comments were not improper.

The record reflects that the prosecutor stated during his rebuttal argument,

And you heard from Lieutenant Patrick from the sheriff's department. And that [is] a controlled environment out there. They control who can talk to who and who can be where, out of their cells and so forth. As much as [defense counsel] wants you to believe that Julio Allen went into [the Defendant's] cell and rummaged through his papers, Lieutenant Patrick and Mr. Allen told you, you can't do that because they're out in the yard.

Defense counsel objected on the basis that the prosecutor's statement was "not true." The trial court stated that "it's argument" and that it was "up to the jury to determine if there's evidence to support that argument." Counsel stated that Lieutenant Patrick testified that "they could pass letters and make calls." The court overruled the objection. The prosecutor continued as follows:

[Defense counsel] wants you to believe that Julio Allen went into his cell and got some papers and rummaged through them. The problem with that is there's no proof of that, absolutely none. Mr. Allen told you, he told me face to face out in the yard that he killed his mother and how he did it, how he stabbed her.

After the jury began deliberations, defense counsel requested a mistrial. Counsel stated that the prosecutor discussed in his argument the controlled environment at the jail. Counsel noted for the trial court that he questioned Lieutenant Patrick about "hall men passing letters and that Lieutenant Patrick responded that such conduct violated jail policy but that it occurred." Counsel noted that the officer agreed an inmate could send an email asking someone to Google any topic. Counsel argued that communication existed within the jail, although the prosecutor told the jury that the officer testified that the jail was a controlled environment. Counsel further argued

It is not a controlled environment, and that's not what the lieutenant said. That's their policy, but the truth of the matter is, there's plenty of communication going on between inmates inside that facility. And that's what the [l]ieutenant testified to, and [the prosecutor] should not have misled the jury in that way.

The trial court found that a jail was a controlled environment. The court found that although evidence was presented that there were opportunities in which someone could enter a cell and see "that stuff," the State was not incorrect by arguing the jail was a controlled environment.

The record reflects defense counsel stated the following during his closing argument:

> But if you walk back in there and say, you know, Julio Allen, really? Did that help? Did that help us decide anything here? Julio Allen told you, yeah, When I got my . . . paperwork in my case, my discovery . . . everything you see in those notebooks over there the defendant has in a box under his bunk, when usually there's at least two people in a cell. And when the door is open, you can go out and someone else can go in, and they can look through your paperwork, or your cellmate can look through your paperwork and talk about it to the next guy when they're out there on break. All that information . . . about the insurance settlement, the insurance money, I got that from the State of Tennessee. They provided that to me in discovery. Here are the insurance documents. So, . . . I give him a copy of it and say, here's the insurance documents. So, they're out there in his cell, loose papers, waiting for a snitch to come along and say, I know . . . about the murder case you can't prove. Let me help you out. You help me, I'll help you.

Lieutenant Patrick testified regarding jail security. He said that generally, inmates were allowed out of their cells about four hours per day and that they were allowed to enter the day room. He said that Mr. Allen and the Defendant were confined in the same area of the jail and would have been allowed out of their cells at the same time. On cross-examination, Lieutenant Patrick stated that an inmate could send an email asking a person to Google a topic and that the inmate could receive a response. He said that the time out of the cell occurred when an opportunity arose and was not at a regularly scheduled time and that correction officers might permit an inmate to use the officer's telephone to place a call. On redirect examination, Lieutenant Patrick stated that it was possible for a "hall man" to take an item from one inmate to another and that communication occurred inside the jail.

The record reflects that the prosecutor's statements were designed to rebut defense counsel's argument that Mr. Allen could have entered the Defendant's cell and read the discovery materials related to the victim's killing. Lieutenant Patrick discussed jail security and the Defendant and Mr. Allen's confinement to the same area and their being allowed out of their cells for about four hours per day. Although Lieutenant Patrick testified that inmates found methods to communicate, were permitted to send and receive emails, and were sometimes permitted to use correction officers' telephones, no evidence

showed the jail was not a controlled environment. The prosecutor did not misstate the evidence. The Defendant is not entitled to relief on this basis.

## VI. Statute of Limitations

At oral argument, this court questioned the parties about whether a statute of limitations barred the Defendant's second degree murder conviction. We permitted supplemental briefs on this issue. The Defendant argues that pursuant to Tennessee Code Annotated section 40-2-101 (1982) (repealed 1989), he was never subject to a sentence of death or life imprisonment and that the statute of limitations for second degree murder had expired before the indictment was returned. The State responds that the Defendant's conviction is not improper because the possible sentence for second degree murder at the time of the offense was ten years to life imprisonment. We agree with the State.

The offense occurred in September 1986. At this time, Tennessee Code Annotated section 39-2-211(c) (1986) (repealed 1989), stated that second degree murder was a Class X felony. The possible sentence for a second degree murder conviction was ten years to life imprisonment. T.C.A. § 39-2-212 (1982) (repealed 1989). Furthermore, Code section 40-2-101(a) (1986) (repealed 1989), stated that "[a]ny person may be prosecuted, tried and punished for any offense punishable with death or by imprisonment in the penitentiary during life, at any time after the offense shall have been committed." As a result, no statute of limitations barred the Defendant's conviction for second degree murder. We note that although the Tennessee General Assembly enacted the Criminal Sentencing Reform Act of 1989, the Act provided that "[f]or offenses committed prior to November 1, 1989, the limitation of prosecution in effect at that time shall govern." *Id.* § 40-2-101(f) (2014); *see State v. Ricci*, 914 S.W.2d 475 (Tenn. 1996) (stating the 1990 revision of Code section 40-2-101 "had no effect on the limitation period applicable" to offenses committed before the revision). As a result, no statute of limitations period barred the Defendant's second degree murder conviction.

We note that the judgment reflects that second degree murder is a Class A felony. However, at the time of the offense in 1986, second degree murder was a Class X felony. *See* T.C.A. § 39-2-211(c) (1986). As a result, we remand for the entry of a corrected judgment.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's conviction but remand for the entry of a corrected judgment reflecting the proper felony classification for second degree murder as Class X.

_____
ROBERT H. MONTGOMERY, JR., JUDGE